UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

              Plaintiff,          Case No. 13-CR-084-JDP

     vs.                 Madison, Wisconsin
                            July 6, 2018
SINOVEL WIND GROUP CO., LTD.,    9:00 a.m.

              Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:
        Office of the United States Attorney
        BY:  TIMOTHY M. O'SHEA
            DARREN C. HALVERSON
        Assistant United States Attorneys
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin  53703

        U.S. Department of Justice
        BY:  BRIAN L. LEVINE
        Computer Crime and Intellectual Property Section
        1301 New York Avenue NW, Suite 600
        Washington, D.C.  20530

For the Defendant:
        Alston & Bird LLP
        BY:  MICHAEL J. AGOGLIA
        560 Mission Street, Suite 2100
        San Francisco, California  94105

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

APPEARANCES CONTINUED:

For the Defendant:
          Alston & Bird LLP
          BY:  ALEXANDER AKERMAN
          333 South Hope Street
          Sixteenth Floor
          Los Angeles, California  90071

Also Appearing:
          Richard Williams, U.S. Probation Officer

                    ***

                **I-N-D-E-X**

GOVERNMENT'S WITNESSES          EXAMINATION          PAGES

DAVID HENRY              Direct by Mr. O'Shea      15-20
                        Cross by Mr. Agoglia       23-28
                        Redirect by Mr. O'Shea     28-31
JOHN SAMIA              Direct by Mr. O'Shea       32-52
                        Cross by Mr. Agoglia       53-61
                        Redirect by Mr. O'Shea     61-61
GORDON DEANE           Direct by Mr. O'Shea        62-73
                        Cross by Mr. Agoglia       75-78
                        Redirect by Mr. O'Shea     78-79
                        Recross by Mr. Agoglia     80-80
SUMUL SHAH             Direct by Mr. O'Shea        81-82
  *(Telephonically)*   Cross by Mr. Agoglia        83-85
                        Redirect by Mr. O'Shea     86-87

              **E-X-H-I-B-I-T-S**

GOVERNMENT'S EXHIBITS                IDENTIFIED   RECEIVED

Ex. S1  - Breach-Related Losses        16           33
Ex. S2  - AMSC Stock Exhibits          33           52
Ex. S3  - Scituate and Fairhaven Damages  73        74
Ex. S4  - Victim Impact Statement      81           83
Ex. S5  - Alternative Loss Calculations  52         -
Ex. 22F - AMSC-Sinovel Contracts       61           -
Ex. 28F - Warehouse Photo              28           -

                    ***

1          (Called to order at 9 a.m.)

2          THE CLERK:  Case No. 13-CR-84, the *United States*

3  *of America v. Sinovel Wind Group Company, Ltd.*, called for

4  sentencing.  May we have the appearances, please?

5          MR. O'SHEA:  Good morning.  Tim O'Shea for the

6  United States.  With me is Brian Levine and Darren

7  Halverson also for the United States.

8          THE COURT:  Good morning to all of you.

9          MR. AGOGLIA:  Michael Agoglia and Alex Akerman of

10  Alston & Bird for defendant Sinovel Wind Group, Ltd.

11          THE COURT:  All right.  And good morning to you.

12          All right.  So we're here for sentencing.  I have

13  read everyone's submissions.  And so normally I do a

14  rundown of the materials I've reviewed.  I don't know if I

15  have a comprehensive list of everything that I have looked

16  at here.  So let me just indicate that I have read the

17  presentence report.  I've gotten the statements of

18  objections from both sides.  I've got an addendum and a

19  revised presentence report.  I have the sentencing

20  memorandum from the government.

21          And then I have the sentencing memoranda in stages

22  from the defendant I've got docketed at 493, 494 and 495.

23  I'll note that the one docketed at 495 was refiled and it

24  was submitted then as docket 496.  So those are the three

25  installments there.

4

1      So that's what I've got here.  Now let's just kind of

2  find out what I'm going to hear and who I'm going to hear

3  from this morning.

4      So, Mr. O'Shea.

5          MR. O'SHEA:  You'll hear from four witnesses this

6  morning, Your Honor.

7          THE COURT:  Okay.

8          MR. O'SHEA:  And then all relating to the 2B1.1

9  loss determination.

10          THE COURT:  Okay.

11          MR. O'SHEA:  Sinovel, in their submissions,

12  suggested that the Court need not make that determination.

13  I can explain why I think the Court should make that

14  determination.

15          THE COURT:  Okay.  All right.  So I've got four

16  witnesses that I'm going to hear from and I will ask you

17  why I'm going to make that determination.  So let's find

18  out from Mr. Agoglia who he's got on tap here for his side

19  of the case.

20          MR. AGOGLIA:  Your Honor, we have no witnesses

21  that we expect to call.

22          THE COURT:  Okay.  All right.  Very good.  Let me

23  just make sure that you've reviewed the presentence report

24  and you've discussed it with your client.  Is that

25  correct?

1          MR. AGOGLIA:  We have, Your Honor.

2          THE COURT:  Okay.  So all of your concerns and

3   objections with the presentence report have been addressed

4   to me then, correct?

5          MR. AGOGLIA:  They have been addressed in

6   writing.  And additionals, as necessary, may be addressed

7   at the hearing.

8          THE COURT:  Okay.  All right.  Very good.

9   So, Mr. O'Shea, I'll let you kind of take the lead here.

10  I have a calculation of the guidelines here that indicates

11  what the guideline -- what the guidelines should be.

12         My first question is why is that relevant?  I know

13  that a component of the guideline calculation is the loss

14  amount which you're going to talk to me about.  But it

15  strikes me that overall, although I'm obligated to

16  calculate the guidelines correctly in sentencing, here

17  it's quite literally irrelevant, isn't it, because the

18  guideline calculation would be used to figure out the fine

19  multiplier which is inapplicable in this case?  And so I

20  really don't have -- there's also obviously no individuals

21  to incarcerate, so it's not relevant to anything like

22  that.

23         So it's a truly academic exercise because the fine is

24  capped at the statutory amount.  Mr. Agoglia has conceded

25  that the amount is at least $50 million, which would

1  justify the $500,000 per-count fine amount, and so I don't

2  know what the guidelines do for us here.

3         MR. O'SHEA:  I suggest the Court should make a

4  2B1.1 loss amount finding and take the evidence for three

5  different reasons.  First, in the event that Sinovel fails

6  to follow through on its agreement to pay the victims,

7  then the Court would have a responsibility to calculate

8  the restitution.  Although the law relating to 2B1.1

9  guideline loss is slightly different than the law that

10  applies to restitution --

11         THE COURT:  Yes.

12         MR. O'SHEA:  -- the Court would apply the

13  different sets of law to the same facts.  The witnesses

14  are here now and they're willing to explain the underlying

15  facts.  So it does not make sense to ask the witnesses to

16  push this back ten months and then ask them come to again

17  if Sinovel doesn't follow through with its commitment.

18  The case is already seven years old.

19      Secondly, the public has a right to know about the

20  harms caused by Sinovel and more generally caused by IP

21  theft.  If the Court does not make a 2B1.1 finding, the

22  Court -- the public may be left with a misunderstanding

23  that the total harm here was the settlement of

24  $57.5 million.  Relatedly --

25         THE COURT:  Didn't the public already have a

1  great insight into what happened to AMSC as a result of

2  the trial?  We went through this in extreme detail.

3          MR. O'SHEA:  We sure did.  And although the jury,

4  I would suggest, implicitly and fulsomely rejected

5  Sinovel's continuous farce that this is a contract dispute

6  and that AMSC's products were of poor quality, frankly,

7  it's time for a judicial finding that that's not true.

8  Sinovel is a thief and they should be held accountable for

9  their criminal conduct.

10          THE COURT:  Well --

11          MR. O'SHEA:  Okay.  So that's --

12          THE COURT:  -- the jury found beyond a reasonable

13  doubt that they had stolen trade secrets, so that's --

14          MR. O'SHEA:  Right, right.  The sentencing

15  submissions would strongly suggest that Sinovel has failed

16  to get that message.  But an independent judicial finding

17  on harm will assist those charged with developing

18  governmental policy both in the United States and in China

19  and will help businesses understand why they need to

20  invest to protect their intellectual property.

21      Also, Sinovel has chosen not to waive its appellate

22  rights and the Court will impose a sentence.  And the

23  factual basis will demonstrate the basis and

24  reasonableness for the sentence should Sinovel appeal.

25          THE COURT:  Okay.

1          MR. O'SHEA:  So those are the reasons.

2          THE COURT:  All right.  Okay.  So I suppose a

3  factor in the guideline calculation is this loss amount.

4  So I suppose we should hear the evidence so I can finish

5  up the calculation of the guidelines.

6          MR. O'SHEA:  Okay.

7          THE COURT:  Before we do that, Mr. Agoglia, do

8  you want to be heard about our activities here today?

9          MR. AGOGLIA:  I do, Your Honor.

10          THE COURT:  Okay.

11          MR. AGOGLIA:  I think it's very clear under the

12  governing Seventh Circuit case law that you are fully

13  empowered to make the 2B1.1 finding on what is already

14  before you, that it is irrelevant and academic to go

15  further than what is clearly established.  And it is a

16  matter of custom and routine that that is how it's done,

17  that these are done very commonly on the basis of the

18  minimum amount to satisfy the really necessary finding

19  here, the only necessary finding with respect to the

20  guidelines, and that is that you have sufficient authority

21  to enter a fine up to the requested maximum and there is

22  no dispute.  The rest of this is irrelevant and improper

23  for what we think are the following reasons:

24      One, this shouldn't be a proxy for a restitution

25  finding.  They are different standards.  There are, at a

1  minimum, an enormous number of significant methodological

2  issues, causation issues, evidentiary --

3          THE COURT:  Let me stop you there, because I

4  agree with you the calculation loss amount and calculation

5  of the restitution amount are two different things.  But

6  the factual information is, I don't know if I'd say,

7  coextensive, but significantly overlapping.

8      So I am going to have to set a restitution amount one

9  way or the other.  I'm inclined to say that we have an

10 agreement between the parties as to the restitution amount

11 and so that will do for now.  But there is this potential,

12 because the restitution hasn't really been paid in full,

13 that if that agreement is breached, I'd actually have to

14 put a number on it and actually set the restitution

15 amount.

16     I agree with you completely that the analysis is

17 somewhat different, so I get that, but the data on which I

18 would base it is still substantially overlapping.

19         MR. AGOGLIA:  Your Honor, we would say, in point

20 of fact, we think a lot of what's been submitted as loss

21 is not, as a matter of law, proper.

22         THE COURT:  I'm going to hear about that.

23         MR. AGOGLIA:  Right.  I'm not sure that you will.

24 I'm not sure that there will, at end of the day, be a

25 disagreement that the parties' agreed-upon restitution

1    amount should not be respected by the government and the

2    Court.  I don't think that's where we're going to be.

3            THE COURT:  I don't think so either.  It's the

4    contingency of having that agreement be breached that

5    we're talking about.

6            MR. AGOGLIA:  And I would say whatever you do

7    today, if that were to happen, you'd have to revisit these

8    issues *ab initio* on resentencing.  That would be, I

9    suspect, AMSC's position, that would be the government's

10   position, and that would be our position.

11       And so you don't cross that bridge now no matter what

12   you do today.  And it's improper because what's really at

13   issue here is whether that putting out a large number in

14   loss amount, which we don't agree would be the proper

15   outcome of a detailed analysis beyond what is already

16   available to Your Honor, whether that would be

17   appropriate.

18       It frankly is a question of what punishments are

19   authorized by Congress for you to mete out here, and among

20   those punishments sullying the reputation of the defendant

21   further, putting their credit worthiness at risk, putting

22   them at risk for delisting, because a loss number and the

23   nuance of loss as it relates to the sentencing guidelines

24   as opposed to a layperson's notion of loss may well not be

25   understood by some analysts in Shanghai, leading to the

1   delisting.

2       There are lots of good reasons why that's

3   inappropriate and mostly because what's really going on we

4   think is a request for an alternative form of punishment

5   which Congress hasn't authorized.  That's not what you're

6   supposed to be doing in the calculation of the loss amount

7   for 2B1.1.  It is really to get you to a point where you

8   are satisfied that you have the authority to do what the

9   government has asked, the max fine, and we have stipulated

10  to that.  So it is, as a matter of law, we think not only

11  irrelevant, but improper to go beyond that in any

12  circumstances.

13      And I don't think again custom or tradition, which

14  has been raised before in this regard, dictates a

15  different outcome.  I think this is exactly how these

16  types of cases are resolved.  And those cases like can't

17  even come up in a context where the underlying loss

18  determination is itself complicated by difficult judgments

19  the Court would otherwise have to face about valuing.

20      The valuing of the trade secret here is a very

21  significant and hotly-disputed item.  We have very

22  different perspectives on the proper methodology and that

23  what has been submitted as loss by the government in that

24  regard isn't within the guidelines, isn't what is

25  otherwise endorsed through --

1            THE COURT:  I understand all of those

2    controversies and I'm going to hear about some of them

3    today.  The question right now is whether I should get

4    into them at all.  It's the kind of thing that I would be

5    called upon to do in a sentencing.  I'm going to have to

6    make a decision about who's right and who's wrong about

7    the valuation on the -- the value of the trade secret, I

8    get that.  I mean, these are some of the issues that have

9    been teed up for me, so I'll make a decision about them.

10       At least the real question is, your real point is, I

11   don't need to get into it at all.  You're prepared to

12   stipulate that the fine of a million-five is appropriate,

13   so I don't even need the loss amount.  Give them the fine;

14   we've got a stipulation on the restitution amount; call it

15   a day.

16            MR. AGOGLIA:  I mean, again in terms of policy

17   and moving this forward, I would also say what is I think

18   obvious, that it also risks creating needlessly, other

19   appellate issues.  Again these are very hotly-contested

20   issues in a methodological sort of basis for how you would

21   make decisions.  And what is clear, everyone accepts, is

22   that you don't need to make those decisions to do what you

23   are required to do here; that is, impose an appropriate

24   penalty.

25            THE COURT:  Mm-mm.  All right.  Very good.  We

1  have the witnesses here.  I'm going to listen to the

2  evidence and see how far it takes me.  I share some of

3  your concerns, frankly.  These are hard issues.  We'll see

4  what evidence I'm given today.  Maybe it will all become

5  very clear and I can make a decision about everything, top

6  to bottom here, and maybe I won't.

7       All right.  So, Mr. O'Shea.

8            MR. AGOGLIA:  Your Honor, one preliminary point

9  of procedure.  Under Federal Criminal Rule of Criminal

10  Procedure 32(f)(2), there are -- if there are going to be

11  witnesses who are going to be making statements, we do

12  request a 26.2 production of any witness statements, as

13  were required.  And if they're not produced, the rule

14  clearly provides that the Court must not consider the

15  witness's testimony.

16            THE COURT:  Mr. O'Shea.

17            MR. O'SHEA:  Okay.  Yeah, we're well aware of our

18  obligation under 26.2.  I provided some spreadsheets to

19  Mr. Agoglia that would be the work of Mr. Samia informed

20  by his consultations with Mr. Henry, so Mr. Agoglia has

21  all the *Jencks* statements he's entitled to.

22            THE COURT:  Okay.  Very good.  All right.

23  Go ahead.

24            MR. O'SHEA:  Before I start calling our

25  witnesses, I just wanted to cover Government Exhibit S --

1   S is for *sentencing* -- 5 in this case.  And what we did

2   there, what the United States did, is to break down

3   alternative loss calculations.

4       Mr. Williams did a fine job summarizing the various

5   points within the presentence report.  But then, as the

6   Court knows, the United States did not support all of the

7   claims.  So these are the claims that the United States,

8   for our part, supports for the loss calculations and that

9   lays out the three different approaches --

10              THE COURT:  Okay.

11              MR. O'SHEA:  -- and does the math.  I did my best

12   to avoid doing mathematics in public, so I worked it out

13   ahead of time and had my colleagues check the math.

14              THE COURT:  All right.

15              MR. O'SHEA:  So first we'll call Mr. Henry.

16          **DAVID HENRY, GOVERNMENT'S WITNESS, SWORN**

17              MR. AGOGLIA:  Your Honor, I apologize.  Another

18   point of order.  If we are going to have witness

19   testimony, we would ask that other witnesses be

20   sequestered.

21              MR. O'SHEA:  Okay.  I guess that's why I asked

22   Mr. Agoglia if he wanted them sequestered before the

23   hearing.  But if he's changed his mind, we can have

24   them --

25              MR. AGOGLIA:  I didn't change my mind, Counsel.

```
 1   I didn't say I didn't want them.  I didn't know who would
 2   be testifying --
 3             MR. O'SHEA:  All right.
 4             MR. AGOGLIA:  -- or making something other than a
 5   victim statement.
 6             MR. O'SHEA:  Okay.
 7             THE COURT:  Okay.
 8             MR. O'SHEA:  The other witnesses will be
 9   sequestered.
10             THE COURT:  All right.  I'll grant the
11   sequestration motion because it's been requested.
12   All right.
13                    DIRECT EXAMINATION
14   BY MR. O'SHEA:
15   Q.   Sir, could you state your name and spell your last
16   name?
17   A.   David Henry.  Last name H-E-N-R-Y.
18   Q.   And what do you do for work?
19   A.   I'm currently the chief financial officer of EOS
20   Energy Storage in Edison, New Jersey.
21   Q.   And did you testify during the trial in January?
22   A.   Yes, I did.
23   Q.   And at that point did you go through a fulsome
24   recitation of your work history and education?
25   A.   I did.
```

1    Q.   All right.  So I will skip that and sort of summarize

2    it here.  But you were, at the time 2011-2012, you were

3    the chief financial officer or CFO of American

4    Superconductor, the victim in this case?

5    A.   Yes.

6    Q.   And you've got a BS and an MBA, you worked for Ernst

7    & Whinney and a number of other energy enterprises on the

8    East Coast; is that correct?

9    A.   Yes.

10   Q.   Let's talk a little bit about Government Exhibit S1.

11   And again some of these losses you talked about at the

12   trial, so we can short-circuit them, but some of them are

13   slightly different and some of them are new.

14        So let's go through, starting at the top.  The

15   *Accounts Receivable*, the 1.8 -- I'm sorry, 108.7 million,

16   what is that?

17   A.   Those are amounts that were due to the company for

18   shipments and intellectual property that was transferred

19   to Sinovel in the equipment or design services for wind

20   turbines.  They were amounts that were delivered and were

21   unpaid as of March 31st, 2011.

22   Q.   Okay.  So that represents Sinovel's debt to American

23   Superconductor?

24   A.   Yes.

25   Q.   And when Sinovel stole AMSC's trade secrets and

1   reneged on the contracts, AMSC lost its leverage to

2   require Sinovel to pay its debt?

3   A.    Yes.

4   Q.    And Sinovel still has not paid any of its debt?

5   A.    No.

6           MR. AGOGLIA:  Objection.  Lacks foundation.

7           THE COURT:  How do you know whether they paid

8   their debt?  When did you leave AMSC?

9           THE WITNESS:  I left AMSC in June of 2017.

10          THE COURT:  Okay.  So at least as of that date,

11  they hadn't paid as of June 2017?

12          THE WITNESS:  That's correct.

13          THE COURT:  Okay.  All right.

14  BY MR. O'SHEA:

15  Q.    Next we've got 68.2.  What is that?

16  A.    In March of 2011 there was product that was waiting

17  to be delivered to Sinovel.  It was actually at their

18  facilities waiting to be accepted.  They refused those

19  shipments.

20  Q.    "They" being Sinovel?

21  A.    They, being Sinovel, refused the shipments and that

22  was the revenue value of those shipments.

23  Q.    Okay.  And at trial we had a slightly different

24  number and the trial number included what's called the

25  VAT; is that correct?

1  A.    Yes.

2  Q.    And what is VAT?

3  A.    Value-added tax.

4  Q.    And why is that backed out for purposes of this

5  sentencing?

6  A.    Because it's not really owed to the government until

7  you deliver.

8  Q.    All right.  And Sinovel refused shipment?

9  A.    Yes.

10  Q.    All right.  Next we've got the *AMSC purchase order*

11  *commitments to fulfill Sinovel contracts* of 40.3 million.

12  What is that?

13  A.    At the time of March 31st, 2011, we were preparing to

14  ramp up our supply chain because we had contracts that

15  Sinovel and AMSC had agreed to for the supply of core

16  components for wind turbines and so we made noncancelable

17  commitments to many vendors to supply us material so that

18  we could deliver product to Sinovel.  And that is what

19  AMSC had to pay to extricate themselves from those

20  purchase commitments.

21  Q.    The next number is 296.2 million.  What is that?

22  A.    That number is the profit that AMSC lost with respect

23  to the contracts that were open at the time and that

24  Sinovel breached.

25  Q.    And is that the amount of expected profit on those

1  remaining core component development contracts?

2  A.   Yes.

3  Q.   All right.  The next is the 24.2 million.  What is

4  that?

5  A.   That amount represents the work in process and raw

6  material inventory that was on-site in AMSC-China March

7  31st, 2011, that was going to be used to build the

8  products that we would ship to Sinovel.

9  Q.   Then the 300,000 legal fees, I'll ask another witness

10 about that.  Could you explain how these losses directly

11 relate to Sinovel's trade secret theft?

12 A.   Well, because of their theft, they no longer needed

13 to do business with AMSC.  And so from their standpoint,

14 the customer relationship, they didn't need it.

15        MR. AGOGLIA:  Objection.  This lacks foundation,

16 commenting on Sinovel's need.

17        THE COURT:  Overruled.  Go ahead.

18 A.   And without that customer relationship and with the

19 IP that they stole in hand, there was no need to fulfill

20 their obligations under those contracts.

21 Q.   As was developed at trial, 700 employees were laid

22 off.  And I want to understand -- from a financial aspect,

23 obviously loss of job, no more income, but tell me about

24 the 401-K match, how that was handled at American

25 Superconductor.

1  A.   So we had a 401-K benefit plan.  And the match that

2  we provided to employees was that for every dollar that

3  they put in, there was a certain percentage that would be

4  matched by the company and would be matched in the form of

5  AMSC stock.

6  Q.   So we'll talk a little bit about the decline in stock

7  value.  But for AMSC employees who were laid off, it was

8  really a double-hit?

9  A.   That's right.

10        THE COURT:  And by that you mean that they would

11  have lost their income, their salary, but also the 401-K

12  contribution?

13        THE WITNESS:  They have the portion of their

14  401-K that was held in AMSC stock.

15        THE COURT:  Okay.

16        MR. O'SHEA:  All right.  Thank you, Mr. Henry.

17  Nothing further for the United States.

18        THE COURT:  Before I -- first of all, you've got

19  to stay there for cross-examination, but I'll ask you a

20  few questions here, too.

21        THE WITNESS:  Okay.

22        THE COURT:  So the *AMSC "work in process"*

23  *inventory and raw materials*, that 24.2, that's the amount

24  that AMSC had paid for those materials that were going to

25  be used in goods for --

1            THE WITNESS:  It was the value of that inventory

2   that was paid for.

3            THE COURT:  Okay.  That's the question I have.

4            THE WITNESS:  Yes.

5            THE COURT:  When you said "the value of it," how

6   did you derive the value?  That's what AMSC paid for it?

7            THE WITNESS:  They paid for it and that's what

8   the purchase orders that were behind the material that we

9   bought called for.

10            THE COURT:  That's AMSC's purchase price on those

11   items?

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.  And then *purchase order*

14   *commitments to fulfill Sinovel contracts*, so those are the

15   amounts that you were obligated to pay your vendors for

16   materials that you had ordered in anticipation of

17   fulfilling the Sinovel contracts?

18            THE WITNESS:  That's right, and had not been

19   delivered, so there's no double-counting going on.

20            THE COURT:  Okay.  And there was no way to cancel

21   those; that was you're going to pay that regardless?

22            THE WITNESS:  Right.

23            THE COURT:  Okay.  So what happened to the

24   materials that you had acquired that you were no longer

25   going to use in the Sinovel materials?

1          THE WITNESS:  We tried to use as many of them as

2    we could for other customers, but a vast majority of them

3    actually ended up in our warehouse in Massachusetts.

4          THE COURT:  Mm-mm.  So some got used in others --

5          THE WITNESS:  Some, yes.

6          THE COURT:  Okay.  And then *AMSC lost profit on*

7    *remaining core component and development contracts*, how

8    did you calculate the lost profit?

9          THE WITNESS:  Based on the gross margin on the

10   sales, the incremental gross margin.

11         THE COURT:  So this would have been the contract

12   price to Sinovel times your gross margin?

13         THE WITNESS:  Yeah.

14         THE COURT:  How did you calculate your gross

15   margin?

16         THE WITNESS:  Gross margin was based on the cost

17   of supplying Sinovel, not only the cost of the materials,

18   but any overhead as well.  It's the incremental cost of

19   that.  There were people and operations that were already

20   there.  Those were sunk costs, so that was the incremental

21   cost of not being able to realize the profit.

22         THE COURT:  I'm a little confused by your comment

23   that it included overhead.  So how is overhead included?

24         THE WITNESS:  No, it doesn't include overhead.

25         THE COURT:  It does not include overhead.

23

1           THE WITNESS:  That's right.

2           THE COURT:  Okay.  So purely the incremental --

3 it was the gross margin on the -- go ahead.

4           THE WITNESS:  What I would call the *contribution*

5 *margin*.

6           THE COURT:  Okay.  All right.  Mr. Agoglia, your

7 cross-examination.

8           MR. AGOGLIA:  Thank you, Your Honor.  And, Your

9 Honor, for the record, we will incorporate directly the

10 cross-examination of Mr. Henry from the trial on these

11 issues.

12           THE COURT:  If you want this to be helpful to me,

13 you're going to have to reiterate here because I was here,

14 but I don't remember.

15           MR. AGOGLIA:  I do understand.  I do that for the

16 record, Your Honor, and will attempt to sort of highlight

17 issues for you on cross now.

18                     CROSS-EXAMINATION

19 BY MR. AGOGLIA:

20 Q.   Starting with your first figure on this chart, the

21 *Accounts Receivable*, this is a figure that you initially

22 calculated in 2013, if I recall your testimony; isn't that

23 correct?

24 A.   I believe so, yes.

25 Q.   And have you done anything in the last year to update

24

1  that figure?

2  A.   I believe the figure has been updated for the most

3  current exchange rates, but I can't be certain.

4  Q.   Okay.  And this figure includes things like the

5  value-added tax, correct?

6  A.   At that time, yes, because we actually delivered

7  product to Sinovel and so they were liable for that

8  value-added tax.

9  Q.   That's not an item that you expect to retain as your

10  money at the end of the day; that's a tax paid to a

11  Chinese authority, as you understood it?

12  A.   Yeah.  If we collect it, we have to remit it to the

13  government, yes.

14  Q.   That's included in your specification of loss here,

15  isn't it?

16  A.   On the *Accounts Receivable*, the 108.7 million, I

17  believe it is, yes.

18  Q.   Isn't it true that in this 24.2 million-dollar *"work*

19  *in process" raw materials*, that also includes an

20  approximate 17% charge for value-added tax?

21  A.   No, I don't believe so, because the *"work in process"*

22  *inventory* is based on just the purchase cost and the

23  purchase cost would be exclusive of VAT.  You do not

24  inventory that.

25  Q.   Are you sure of that?

1   A.   When I was there, we did not inventory VAT.

2   Q.   Are you sure that this 24.2 figure does not include a

3   17% markup for VAT?

4   A.   To the best of my knowledge, it does not include it.

5   Q.   Okay.  Let me go back to the *Accounts Receivable* 68.2

6   million-dollar figure for an amount that's line-itemed

7   *Amount Sinovel contracted to pay for March 2011 shipments.*

8   You understand that in the contracts there was a

9   requirement that the goods that were being provided to

10  Sinovel had to meet certain requirements, correct?

11  A.   Yes.

12  Q.   And that included meeting the strictest global grid

13  code requirements for LVRT explicitly in the contracts

14  under which these goods were shipped?

15  A.   Sure.  Yeah.

16  Q.   And if in fact AMSC did not perform by shipping such

17  goods, you wouldn't expect to be paid the contract amount

18  for those items?

19        THE COURT:  I'm going to allow this question, but

20  that's it.  I don't want to relitigate the whole question

21  about whether this was a breach of contract or the result

22  of the theft of the trade secrets.  We're not going into

23  that again.  Go ahead and answer that question.

24  A.   Can you repeat your question, please?

25  Q.   Yes.  In order for these *Accounts Receivable* and the

1  108.7 million-dollar figure and 68.2 million-dollar figure

2  to be accurate, AMSC would have had to fulfilled its

3  contract obligations, including having shipped goods that

4  met the contract standards of meeting the strictest global

5  grid code requirement for LVRT; isn't that right?

6  A.   In order -- sure.  Yes.

7  Q.   Okay.  The future deliveries lost profit, that's all

8  for deliveries that you had not actually provided as yet?

9  A.   It was the lost profit on the contracts that were not

10 fulfilled by Sinovel.

11 Q.   And they were not contracts where you had delivered

12 product to Sinovel, correct?

13 A.   No.

14 Q.   Right.  These were future profits that you expected

15 to make?

16 A.   That's right.

17 Q.   And the margin that you used for calculating this was

18 50%, wasn't it?

19 A.   Yep.  Sounds right.

20 Q.   And do you recall being involved, as chief financial

21 officer, in the submission of regulated filings to the SEC

22 and SEC-related filings about what your gross margin had

23 been on prior sales of your components at AMSC?

24 A.   Yes.

25 Q.   And it's true that in prior SEC-regulated filings you

1   had disclosed gross margins substantially below 50%?

2   A.    That is correct, but I will say that those are gross

3   margins for the total company and not for just Sinovel.

4   We did not disclose what our gross margin was for Sinovel;

5   we disclosed for the total company.  In the total company,

6   the other businesses had losses that were associated with

7   them.  The wind business generated profit.

8   Q.    Sinovel represented approximately 80% of AMSC's

9   business during this time period you're talking about,

10  right?

11  A.    Roughly.

12  Q.    Right.  So 80% of what you sold was reflected in

13  those prior gross margin filings with the SEC which were

14  substantially less than 50%; isn't that fair to say?

15  A.    That is correct.  But remember what I explained to

16  the judge on the gross margin: It is the incremental gross

17  margin, what I call the *contribution margin*, not the U.S.

18  GAAP gross margin, because there were costs that were

19  already embedded in the company that were going to be

20  there regardless of whether we delivered to Sinovel or

21  not.  And those costs are not part of that, but they're

22  factored into the gross margin that we would report to the

23  SEC and to the public.

24  Q.    What you report to the SEC, as the chief financial

25  officer, is something that you certify to be an accurate

1  statement of the gross margin as it is understood in the

2  entire industry; isn't that correct?

3  A.    Yeah.

4  Q.    The amount of the raw materials and inventory that

5  you had purchased in expectation of making future

6  deliveries of components to Sinovel, did you calculate

7  what value you received by selling a portion of those to

8  other customers or getting money from them in some other

9  way?

10  A.    I did not calculate that, no.

11        MR. AGOGLIA:  Your Honor, I think that's all we

12  have for Mr. Henry.

13        THE COURT:  All right.  Any redirect?

14        MR. O'SHEA:  Yes, a couple.

15                   REDIRECT EXAMINATION

16  BY MR. O'SHEA:

17  Q.    So this was admitted at trial.  These were one of

18  several exhibits that was Government Exhibit 28F.  You say

19  that the materials that were to be delivered to Sinovel

20  were just boxed up and warehoused, many of them?

21  A.    Yeah.  And that's a representative picture of some of

22  the inventory that was in our warehouse in Massachusetts.

23  Q.    Okay.  Now, the judge asked, and I want to make sure

24  I understand that, the judge asked, "Well, you were able

25  to sell off some materials, some parts, repurpose them."

29

1  The amount recovered, is that reflected at all in any of

2  the figures on Government Exhibit S1?

3  A.   I don't think it is.  It's hard to -- the amount that

4  we tried to use, it was an immaterial, what I would call,

5  an *immaterial number* and one that we didn't really

6  track --

7  Q.   Okay.

8  A.   -- the vast majority of what was used, what was left

9  over and that we could not ship.  Sinovel's product was

10 fairly unique.  It was 1 1/2 megawatt wind turbines that

11 used -- and a lot of materials really specific for them

12 couldn't be used for other customers.  We used what we

13 could, but it was a small portion of the overall amount.

14 Q.   Okay.  Well, I'm going to -- I'm asking the judge to

15 do some math here and that number probably should be

16 factored out.  So if you were to take the highest possible

17 estimate of the materials that were sold and then double

18 it, what would that number be?

19          MR. AGOGLIA:  Your Honor, calls for speculation.

20          THE COURT:  No, it calls for an estimate.  Go

21 ahead.

22 A.   I would say maybe 10%.

23 Q.   10% of what?  We have a lot of numbers on there.

24 A.   10% of the 24.2.

25 Q.   Okay.  All right.

1   A.   So I would say that, you know, maybe 10% of it we

2   were able to use some in some other fashion.

3   Q.   So then --

4   A.   $2.4 million, so if you do $2.4 million and double

5   it, $4.8 million.

6           MR. O'SHEA:   Okay.  All right.

7           THE COURT:   It's a little bit different, but you

8   have the *purchase order commitments to fulfill Sinovel*

9   *contracts* at 40.3 million.  Did you get any of the

10  materials in response to that or did you just give them

11  money?

12          THE WITNESS:   Those were called *adverse purchase*

13  *commitments*.  And so they were deemed adverse and recorded

14  as such because we couldn't use the material.

15  BY MR. O'SHEA:

16  Q.   And does that mean you did not accept recovery; this

17  was just something sorted out with the --

18  A.   There was some we actually had to take delivery and

19  ended up scrapping and others were just settlements that

20  we entered into with companies.

21  Q.   So when you say you "ended up scrapping," did it cost

22  you to get rid of that material or, alternatively, did you

23  recover something?

24  A.   No.  When you scrap it, there's very little to be

25  recovered.

1  Q.   All right.   Oh, on the profit, Mr. Agoglia asked you

2  about the profit reported in public filings.   And you said

3  that that, and as I understand it, is around 36% overall

4  profit.   Is it fair to say that other areas of the

5  business, developing areas of the business, were supported

6  by the wind business profits?

7  A.   Exactly.   That's what I was trying to communicate,

8  that even though the incremental gross margin on the

9  Sinovel business was 50%, there were other elements of the

10  AMSC business that were losing money, had even in some

11  cases negative gross margins, so the Sinovel business

12  helped subsidize those other businesses.

13          MR. O'SHEA:   All right.

14          THE COURT:   This came from Mr. O'Shea, but I want

15  to make sure it's from you:   Your gross margin reported

16  for the company as a whole was about 36%; is that correct?

17          THE WITNESS:   It was in that ballpark.   I'm

18  willing to assume that the number he quoted me was

19  accurate.

20          THE COURT:   Okay.

21          MR. O'SHEA:   Nothing further for the United

22  States.   Thank you.

23          THE COURT:   All right.   Thank you, Mr. Henry.

24  Next witness.

25          MR. AGOGLIA:   Your Honor, just for the record,

```
 1   the SEC filings that were submitted and examined Mr. Henry
 2   with at the time contained gross margins reported in the
 3   20 percents and those are a matter of record.  We can
 4   identify those by exhibit if you'd like us to.
 5              THE COURT:  Thanks.  I would.
 6         (Witness excused at 9:43 a.m.)
 7              MR. O'SHEA:  Mr. Samia.
 8              MR. AGOGLIA:  In fact, I think those are
 9   identified in our addendum, Your Honor.
10              THE COURT:  Okay.
11         JOHN SAMIA, GOVERNMENT'S WITNESS, SWORN
12                   DIRECT EXAMINATION
13   BY MR. O'SHEA:
14   Q.   Would you please state your name and spell your last
15   name?
16   A.   Sure.  It's John Samia, S-A-M-I-A.
17   Q.   What do you do for work, sir?
18   A.   I'm the vice president, general counsel and corporate
19   secretary at American Superconductor Corporation.
20   Q.   And how long have you worked for American
21   Superconductor?
22   A.   A little over ten years.
23   Q.   How long have you practiced as an attorney?
24   A.   20 years.
25   Q.   Were you ever in financial analysis?
```

1  A.   Yes.  After I graduated from college in 1992, I

2  worked for General Electric in its Financial Management

3  Program, which is a rigorous combination of financial

4  positions together with MBA-level courses.  That was a two

5  and-a-half year program which I graduated from with

6  distinction before going to law school.

7  Q.   All right.  Before -- I'm going to talk to you about

8  Government Exhibit S1 before we talk about Government

9  Exhibit S2.  And I'm just going to ask you about the

10  bottom figure there, the $300,000.  What is that?

11  A.   That number is a rounded-down figure which represents

12  costs that we expended on U.S. counsel, Robins Kaplan,

13  that helped us respond to the subpoenas from defendant's

14  counsel in this case.

15  Q.   So that was -- those are costs related to responding

16  to defense in the criminal case, this criminal case?

17  A.   That is correct.

18       MR. O'SHEA:  The United States at this point, for

19  what it's worth, would move in Government Exhibit S1.

20       THE COURT:  Okay.  Is there any objection?

21       MR. AGOGLIA:  No, Your Honor, understanding that

22  Rule 1101 applies to this proceeding.

23       THE COURT:  Okay.  So I'll receive S1.

24  BY MR. O'SHEA:

25  Q.   So let's talk about Government Exhibit S2.  That's a

1  three-page exhibit, so let's take --

2         THE COURT:  Before we move on, let's just --

3         MR. O'SHEA:  Yes.

4         THE COURT:  -- while we're on that subject, just

5  give me a little bit more detail on how you came up with

6  the $300,000 fee, amount of fees, for the U.S. counsel

7  responding to subpoenas.

8         THE WITNESS:  Sure.  We engaged this firm to help

9  us specifically once we received the first subpoena from

10  defense counsel.  And the number actually was 325,000

11  based on actual invoices.

12         THE COURT:  Okay.  So Robins Kaplan just did the

13  work on the subpoena; they did not represent you in the

14  civil litigation?

15         THE WITNESS:  No.

16         THE COURT:  So this firm just did that work,

17  correct?

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.  Thank you.  Go ahead,

20  Mr. O'Shea.

21         MR. O'SHEA:  Thank you, Your Honor.

22  BY MR. O'SHEA:

23  Q.   All right.  So let's start on the first page and

24  we'll kind of take it -- I can move it around as you need

25  to explain, but the numbers are sufficiently small.  We

1    should probably just focus in.

2    A.    Mm-mm.

3    Q.    What is the first page generally and then we'll

4    explore the numbers a little bit.  What do we see on the

5    first page?

6    A.    Okay.  Starting with the table at top, this was the

7    market capitalization of American Superconductor as of the

8    dates in the upper left-hand corner: the 3/31 date, the

9    end of our fiscal '10; the April 6th date of 2011, the

10   date after our press release relating to the shipments

11   that were refused; April 5th, 2012, the year later; and

12   then 3/16/2018, which happened to be the date when these

13   materials were prepared.

14        If you go down the sheet, all of the information

15   that's found in this table, from price per share to number

16   of shares, that's what's here.  So if you go, starting on

17   the left-hand side, the shares outstanding as of 3/31/2011

18   and 2012, those are directly from our Form 10-K that were

19   filed with the SEC.

20        And as you go further down, the *Stock Price History*,

21   from left to right, it's the March 31st, 2011 date as well

22   as the April 6th date of 2011.  And on the lower

23   right-hand corner it is the year -- 2012 date that's also

24   on the table up top.

25        Just for point of clarity, the price that we had or

1   what's showing here, why it's a larger number, is because

2   in March of 2015 we had a reverse stock split.  So $24.87,

3   which was the price back in 2011, would now show up ten

4   times that amount.

5   Q.   I see.  Okay.  So up at the top I'm going to ask you

6   to -- so this is our starting date, March 31 --

7   A.   Correct.

8   Q.   -- 2011.  Is that the same day that Sinovel refused

9   shipments to American Superconductor?

10  A.   That's the end of our fiscal year and that's when it

11  refused shipments, that's correct.  But publicly, that was

12  not announced.

13  Q.   And that was announced by American Superconductor on

14  April 5 --

15  A.   Correct.

16  Q.   -- of 2011?

17  A.   We filed an 8-K where we updated our guidance on

18  financial information including the fact about Sinovel.

19  Q.   And the day after your announcement April 6th, 2011,

20  we see a, and we'll see it on the second page sort of in

21  graph form, a precipitous decline?

22  A.   That's right.

23  Q.   Okay.  And explain, in terms of market share, what

24  that means.

25  A.   So in one day from that announcement, and if you

37

```
 1    could scroll down a little further --
 2    Q.    Sure.
 3    A.    -- you see the price on April 5th, 2011.  Go a little
 4    more.
 5    Q.    You can use your fingers.
 6    A.    Oh, I'm sorry.  Gotcha.  So even the day before the
 7    5th, we were still 24 -- I can't read that number there,
 8    but around 24.87.
 9    Q.    Yeah.
10    A.    And then after that announcement, the full trading
11    day after that announcement, we had fallen.
12    Q.    Whoops.  Apparently it doesn't stop.  Okay.
13    A.    But we had fallen where, if you take the same
14    calculation of number of shares outstanding times our
15    close price, it was a 527 million-dollar drop in market
16    capitalization.
17    Q.    Okay.  A 527 million-dollar drop?
18    A.    Correct.
19    Q.    Okay.  And that is perhaps more simply reflected in
20    the table at the top?
21    A.    That's right.  Yes.
22    Q.    Okay.  That's there --
23    A.    Mm-mm.
24    Q.    -- 527 million.  And let's look at the second page
25    where the information is shown in graph form.
```

1  A.    Mm-mm.

2  Q.    We have two graphs, both representing periods of

3  time.   First period of time is end of March and beginning

4  of April 2011?

5  A.    Mm-mm.

6  Q.    And then on the bottom again end of March but now

7  extending past July 2014?

8  A.    Mm-mm.

9  Q.    Do those both fairly and accurately reflect how the

10  AMSC stock fared over those two time periods?

11  A.    They do.

12  Q.    All right.   Now, Sinovel has repeatedly brought up

13  two different pieces of litigation as influencing your

14  stock as well.   So let's talk about the first of which,

15  April 6th, 2011, there's a class action filed.   Did that

16  class action directly relate to Sinovel's crime?

17  A.    It did.

18  Q.    How so?

19  A.    Well, we had completed an offering in November of

20  2010 where we raised approximately $150 million.

21  Q.    And in connection with that offering, did you make

22  certain statements to the market?

23  A.    Correct.   And there was nothing about the contract to

24  this extent.   Obviously we didn't know back in November

25  '10 that Sinovel refused shipments and ultimately what was

1  learned.

2      On April 6th, this is not uncommon, where there are a

3  plaintiff's bar out there, that if there's a large drop in

4  stock price that they're going to look for a class of

5  litigants that will proceed with a class action

6  proceeding.  And in this case there was a large drop from

7  24.87 to 14.47 and it's not hard to get the minimum level

8  of litigants to participate in that.

9  Q.   All right.  Okay.  And this class action was filed

10  just one day after your press release saying "Hey, Sinovel

11  has refused shipments"?

12  A.   Mm-mm.  Yes.

13  Q.   And then this same information is expressed in a

14  longer timeline on the second -- on the bottom of the

15  second page of Government Exhibit S2.  What do we see

16  there?

17  A.   What I see here is a similar chart, but it's brought

18  out in 2014 when there was an insider trading action filed

19  against certain individuals.

20  Q.   And you suggest that the appropriate time the Court

21  should consider is from basically April to April, 2011 to

22  2012, with a stock loss of over a billion dollars.  If

23  that's the case, if we're ending in April 2012, then

24  anything that would have happened in 2014 would not have

25  influenced this stock drop ending in 2012?

40

```
 1  A.    Correct.
 2  Q.    The class action suit, essentially what it said is in
 3  your -- to paraphrase, it claimed that you had failed to
 4  accurately report earnings -- actual earnings in
 5  anticipated revenue and essentially what you'd said in
 6  your previous filing is that you had expected Sinovel
 7  would pay its bills and honor its contracts; is that
 8  right?
 9  A.    That's correct.
10            MR. AGOGLIA:  Objection, Your Honor.  It is
11  leading.
12            THE COURT:  I'll allow a little bit of leading so
13  we can get through this.  Go ahead.  Overruled.
14  BY MR. O'SHEA:
15  Q.    And stock declines that we see here stem from the
16  revenue loss; is that essentially it?
17  A.    Yeah.  It's the announcement that this -- the price
18  is from the announcement that we're not going to meet
19  guidance and we didn't know when at that point our
20  customer would take shipments and that's a reaction to
21  that release.
22  Q.    And you didn't know at the time, obviously it took a
23  while for you to figure that out, but did you eventually
24  learn that the breakup occurred because Sinovel had stolen
25  your intellectual property?
```

1   A.   We did.

2   Q.   And you talk about three different ways to calculate

3   losses in the presentence report.  The first one is the

4   loss in market value and you suggest that that loss in

5   market value, over a billion dollars -- reflected at the

6   bottom in yellow, the bottom of the first page -- that is

7   attributable to Sinovel because it all stems from their

8   theft of your trade secrets?

9            MR. AGOGLIA:  Objection.  Calls for speculation.

10           THE COURT:  I don't think so.  Overruled.

11  A.   That's correct.

12  Q.   Then in the last page to Mr. Williams you proposed

13  two other ways for the Court to consider your -- different

14  ways to think about the losses.

15       Now, Mr. Henry talked about some sort of historical

16  losses.  So these would be in addition to the historical

17  losses and these are sort of more future-oriented losses.

18  And you broke those out into a lost IP value and a lost

19  gross margin approach.  So let's walk through those and

20  then I'll ask you to explain to the Court how you

21  calculated those.

22       But first let's talk about the lost IP value

23  approach.  You've got a number there, 296-million-plus,

24  and behind that you say, we have got in parentheses,

25  *(annual revenue selling components to Sinovel)*.  How did

42

1    you calculate that annual revenue amount?

2    A.    Sure.    What I did is I took our fiscal 2009 and 2010

3    revenue and I figured out the amount that's attributable

4    to Sinovel.  So they were approximately 70% of our revenue

5    during those two years.  And our annual revenue was

6    approximately $300 million, so that's about 210 million

7    per year.

8        However, what our revenue did not include was the

9    value of the refused shipments and the accounts receivable

10   that was never paid for.  So it's approximately -- when

11   you add all that up, you get about $600 million,

12   approximately.  So when you look at over two years, it was

13   about 600 million attributable to Sinovel only.  So

14   divided by two, that's where I came up with the 296.8

15   million-dollar number.

16              MR. O'SHEA:  All right.

17              THE COURT:  And you're going to have to walk

18   through that a little more slowly.

19   BY MR. O'SHEA:

20   Q.    Okay.  So let's go through that again.

21   A.    Yep.

22   Q.    So what two years are you looking at?

23   A.    Fiscal '9 and fiscal 2010.

24   Q.    All right.

25   A.    If you were to look at American Superconductor's

43

1  revenues, our total revenues --

2  Q.   All right.

3  A.   -- we were approximately $300 million per year.

4  Q.   All right.

5  A.   As our public disclosure says, Sinovel was 70% of our

6  revenue those two years, so that makes it about 210

7  million each year, so that's 420 million.  What's not --

8  Q.   For the two years, okay.

9  A.   Correct, for the two years.  What's not included in

10 that number are two things: one, accounts receivable, so

11 shipments -- but they weren't paid for.  We didn't

12 recognize revenue on that.

13 Q.   All right.

14 A.   That's 108 million -- plus the refused shipments of

15 68 million.  So when you add all of that together, you get

16 about $600 million over two years.  And then I divide it

17 by two to come up with an annual amount.  That's the

18 information we had on full-year shipments to Sinovel.

19          MR. O'SHEA:  Okay.

20          THE COURT:  Okay.  So the accounts receivable,

21 that 108 million, that is the 108 million that's on

22 Government Exhibit S1?

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  And so that, those accounts

25 receivable, were for what years?

1              THE WITNESS:  I believe it was over the previous

2    -- I couldn't exactly tell you, Your Honor, but I believe

3    it was over the previous year.

4              THE COURT:  Okay.  And then the refused

5    shipments, you included that.  So basically if Sinovel had

6    met its obligations, paid its bills and accepted the

7    shipments, then that rounds out that 210 million and gets

8    it up to --

9              THE WITNESS:  Up to 296.

10             THE COURT:  -- 296?

11             THE WITNESS:  Correct.

12   BY MR. O'SHEA:

13   Q.   But I want to make sure that -- let me ask you a

14   couple questions, because I want to make sure we're all

15   singing off the same sheet of music.  Here you're doing

16   your best to estimate what American Superconductor would

17   have earned independent from the losses that Mr. Henry

18   talked about going forward?

19   A.   These are prospective.  It's trying to figure out a

20   value of what we lost by no longer having this contract in

21   place.  It's prospective.  There's probably a very similar

22   number of 296 that Mr. Henry may have testified to, but

23   that represents existing backlog, not a prospective look

24   at what was also lost.

25   Q.   Okay.  And this assumes, it all assumes, that Sinovel

1  would have continued to need American Superconductor.  So

2  we're not talking about the contracts that were already

3  signed; this is an attempt to look forward; is that right?

4  A.    Correct.  That's right.

5  Q.    So once the intellectual property was taken, you had

6  no way to get it back?

7  A.    That's right.

8  Q.    And you -- and we're not going to get into the

9  litigation in China, but you believe that Sinovel

10  continued to use your intellectual property, at least they

11  had the ability to use it?

12  A.    That's correct.

13  Q.    So you're trying to look forward here?

14  A.    Right, because together with the intellectual

15  property, the way the contracts were set up is that the

16  component sales were inextricably linked to the IP, so

17  that's what we're looking at going forward.

18  Q.    Well, let's explore that then.  You've also got the

19  total annual revenue estimated going forward times 25% and

20  you say there that's the value of the IP --

21  A.    Mm-mm.

22  Q.    -- and everything that you sent.  How did you come up

23  with that number of the 25%?

24  A.    Sure.  And if I may, I'll take them in tandem.

25  Q.    Sure.

1    A.    So what we looked at with the value of the

2    intellectual property, it goes back to what I was just

3    saying: It's inextricably linked to the component sales.

4    So I view them as together because but for the IP, which

5    we saw they're no longer taking component sales from us.

6    So if our margin is 50%, it's fair to say that the value

7    of the IP and the margin was also likewise 50% because

8    that was the value of the IP.

9          The other way we looked at it was -- okay.

10          THE COURT:  You lost me there.

11          THE WITNESS:  So because the IP and because the

12    way the contracts are set up, the IP and the components

13    are linked.  You take our product under the license, you

14    take our IP, you buy our products.  So they're one in the

15    same.  So they're related.

16          So that's why, if the margin on our sales of products

17    to them is 50%, it's because it's tied together with the

18    license.  They had to buy our products.  That was the way

19    it was set up.

20          THE COURT:  Okay.

21          THE WITNESS:  So that's the 50%.  And the 25%

22    margin on the lost IP approach was, okay, we said the IP

23    has half the value of the margin, so we get a 50% margin

24    from all the sale of our goods.  We just said we'll

25    ascribe half of that.

 1          THE COURT:  How did you decide that it was half?

 2          THE WITNESS:  It's ballpark.  We didn't have a

 3   scientific way, Your Honor, but it was --

 4          THE COURT:  Explain to me what nonscientific way

 5   you did.

 6          THE WITNESS:  It was looking -- it was basically

 7   looking at our margin instead of the 50% and we looked at

 8   it and split it in half.

 9          THE COURT:  All right.

10   BY MR. O'SHEA:

11   Q.  Now, there's an argument to be made that that is

12   extremely conservative to say 25% because as soon as

13   Sinovel had the source code for the PLC and the compiled

14   stolen code for the PM3000, Sinovel completely cut you

15   off.

16   A.  That's right.

17   Q.  So you could reasonably say --

18          THE COURT:  That is way beyond leading.  You're

19   just testifying.

20          MR. O'SHEA:  Okay.

21          THE COURT:  Ask him the question about how he

22   came up with 25%.  And if you can get anything more than

23   he just split it in half --

24          MR. O'SHEA:  Okay.

25          THE COURT:  -- I want to hear it.  But from what

1   I'm hearing right now, it's just "We had some equipment

2   and some software, two things, cut it in half, 25%."

3              MR. O'SHEA:  Okay.

4              THE WITNESS:  No, no, no.

5   BY MR. O'SHEA:

6   Q.   Is there -- could you explain -- if there's an

7   argument for why that's conservative, explain, please.

8   A.   So let me go back to the -- going back to the 50%,

9   Your Honor, that if you look at it that they know --

10             THE COURT:  The 50% I basically understand.

11             THE WITNESS:  Okay.

12             THE COURT:  I think I have a handle on how you

13  came up with the 50% being your contribution margin.  And

14  I understand too that the way you priced your product was

15  that you didn't say, "Here's our power converter bare

16  without any software and here's our software.  Power

17  converter is hundred dollars, software also a hundred

18  dollars."  You wrapped it all up and you said, "It's $200

19  for the whole thing."  And so your pricing didn't include

20  a separate fee for the software.

21             THE WITNESS:  That's right.

22             THE COURT:  So now we've got to figure out when

23  somebody bought this, how much of the $200 were they

24  paying for the software and that's the analysis I'm trying

25  to get to.  Like how would you figure out that, "Yeah, if

1    we were to sell this without the software, it would be X,

2    and with the software it's X plus Y"?  So help me

3    understand how you got there.

4           THE WITNESS:  Well, that's what I was trying to

5    explain, and let me try again, is that what I was trying

6    to do here is say that if we were to give them a license

7    and they were never to buy from us again, what would that

8    come up to and what would we be losing, in effect, with

9    the revenue, the future revenues, from our product.  So

10   that's how, and I'll go to the 25% in a second --

11          THE COURT:  Yeah.

12          THE WITNESS:  -- that's how I went to the 50%,

13   because what we would be in essence doing is telling our

14   customer, "You don't have to buy from us anymore."

15       But the whole point of the relationship was, "We'll

16   license this to you, but you buy from us."  But now we

17   have to figure out what we're losing as a result of just

18   handing over the IP and no longer having to buy from us,

19   so that's where the 50% came from.

20       The more conservative number was, and I'd say it's

21   50%, was just to say, "Okay.  What if you split it in the

22   middle and say only half of it?"  My argument would be

23   it's the full 50%.  And that's the methodology there that

24   now they don't have to take product from us.  That's where

25   the market is --

1            THE COURT:  Does the concept of a convoyed sale

2   mean anything now?  Sometimes if you have valuable

3   intellectual property, you can work out a deal with them

4   that says, "Hey, we have this patent.  We'll let you use

5   it, in a sense.  But in order to use it, you've got to buy

6   our equipment.  The equipment itself, you know, maybe you

7   can buy that somewhere else.  It's not covered by the

8   patent.  But if you license our patent, then you're also

9   going to buy this product from us and we'll make some

10  profit on the product as well."

11       So that's the kind of situation that you have.  You

12  have a bundle in which you have included your intellectual

13  property and some equipment at the same time.  And so

14  you're making some profit on the equipment component and

15  you're making some profit on the software.  Maybe the

16  software really dominates the whole thing and you just

17  give them the equipment.

18       But I need some way of parsing out how much money you

19  made on the equipment sale versus on the software sale.

20  You didn't price it separately, you didn't sell them

21  separately, but somehow we have to apportion that, so now

22  I'm trying to figure that out.

23            THE WITNESS:  Yeah.  I don't have the exact

24  numbers on that because I know the way it was priced -- I

25  mean, look at the license fee -- it's relatively modest

1    with the idea on the --

2              THE COURT:  One way you might do this is you look

3    at the industry and you'd say, "Actually, there's a market

4    for software for power converters.  And we see that if you

5    just bought power converter software off the rack, it's X

6    per unit and so that's our comparator.  Our software is a

7    lot better, so it's worth more."  But you have some sort

8    of comparison where you kind of parse it out and figure

9    out this is the value of the software independent from the

10   products.

11             THE WITNESS:  Yeah.  We didn't -- I don't have

12   that.

13             THE COURT:  Okay.  All right.

14   BY MR. O'SHEA:

15   Q.   So what the Court described is the bundled.  That's

16   reflected in the loss gross margin approach?

17   A.   That's right.

18   Q.   So you two have sort of talked that through, so I'm

19   not going to ask that.  The 25% -- well, the Court

20   suggested perhaps there's a way to sell a PM3000

21   software -- PLCs off the shelf, but that just wasn't your

22   business?

23   A.   That's not our model.

24   Q.   So the 25%, is that a conservative estimate had you

25   been forced to sell your intellectual property as a

52

1  stand-alone item?

2  A.   That's correct.  There's another data point.

3         THE COURT:  All right.  It takes us as far as it

4  takes us.

5         MR. O'SHEA:  Yep.  The United States moves in

6  Government Exhibit S2.

7         THE COURT:  All right.  And I'll check and see if

8  there are any objections to S2.

9         MR. AGOGLIA:  No, Your Honor.

10        THE COURT:  Okay.  It's accepted.

11        MR. O'SHEA:  All right.  Nothing further,

12 although I would note for the summary chart I put together

13 for the Court and defense counsel that is S5, the United

14 States only took the six-year numbers and did not include

15 the ten-year numbers, again with the eye towards being

16 conservative.

17        THE COURT:  Okay.  Noted.

18        MR. O'SHEA:  Mr. Deane.

19        THE COURT:  Okay.  Hold on.  There's some

20 cross-examination.

21        MR. O'SHEA:  I apologize.  My bad.

22        MR. AGOGLIA:  Thank you, Your Honor.

23        THE COURT:  Maybe you worked this out in advance.

24 I don't know.

25        MR. O'SHEA:  Nope.

53

1           THE COURT:  Mr. Agoglia, cross-examination.

2           MR. AGOGLIA:  Thank you.

3                      CROSS-EXAMINATION

4  BY MR. AGOGLIA:

5  Q.   Good morning, Mr. Samia.

6  A.   Good morning.

7  Q.   The stock drop that you've discussed was, as you

8  understand it, triggered by the announcement to the market

9  on April 5th, your press release, that Sinovel had

10 rejected the shipment of component parts; is that correct?

11 A.    Correct.

12 Q.   And you understand from your involvement in these

13 disputes that have arisen between Sinovel and AMSC that it

14 was Sinovel's position that those goods did not meet the

15 contract requirements; you understood that was Sinovel's

16 position?

17           MR. O'SHEA:  Objection, Your Honor.  Relevance to

18 the sentencing hearing.

19           THE COURT:  Yeah.  Mr. Agoglia, I've already

20 explained my position on this.  I understand your point.

21 Don't think that I'm rejecting the point entirely; it's

22 just I heard about this for hours on end.

23           MR. AGOGLIA:  And it's a "beat the dead horse"

24 issue.  But if it's a relevance issue, then that's

25 something we can take up separately with the Court.

54

1           THE COURT:  Yeah.  I think we're going to have to

2    discuss this, but I think I'm well familiar with the facts

3    that underlie this.

4    BY MR. AGOGLIA:

5    Q.   The lawsuit that followed the next day that you've

6    spoken about, am I correct that the theory that the

7    plaintiffs' lawyers pursued in that lawsuit was that you

8    had committed securities violations or acted

9    inappropriately because you had booked the revenue for

10   those shipments contrary to generally accepted accounting

11   principles?

12   A.   To clarify, but for what your client did, there

13   wouldn't have been a securities class action suit.  But

14   I'm not qualified to -- on the GAAP issue, I would defer

15   to Mr. Henry on that answer.

16        But it related to, from my recollection, and I was

17   not integrally involved with it at that point, but it's

18   not uncommon with a large stock price drop to have

19   plaintiffs' lawyers come and assert their claims, which is

20   what they asserted, "You knew or should have known."

21   Correct, that's what they said.

22   Q.   Are you aware or are you not aware that the basis of

23   this lawsuit was that AMSC had recognized the income on

24   these shipments which Sinovel then rejected?

25   A.   It was a question of there were many things that were

1  inserted in the securities class action suit which were

2  consolidated, some of which may have been related to that.

3  I don't know exactly every claim that was in there.

4  Q.   And you don't know whether that was a central claim

5  in this lawsuit?

6  A.   It was ultimately settled, ultimately did relate to

7  the action that your client had done.

8  Q.   Did it also relate to your GAAP compliance?

9  A.   No.   It related to the action that your client had

10  done.

11  Q.   So didn't -- there were claims in the --

12  A.   But for what your client had done, there would not

13  have been an issue.   It's that simple.   The April release

14  happened and on April 6th the securities class action suit

15  happened.

16  Q.   I understand that.   I'm just asking whether you can

17  confirm for the Court --

18  A.   I --

19  Q.   Just hear me out.   We have to create a clean record

20  here for a question and answer.

21  A.   Sure.

22  Q.   I know you're trying to jump in on this.   But isn't

23  it your understanding that a central claim in these

24  lawsuits was not just that the stock had dropped, but that

25  AMSC had inappropriately recognized the income from those

1   shipments already?

2   A.   I don't recall.

3   Q.   Let me again turn to -- if we could put up -- this is

4   page 3 of what has been marked as Government Exhibit S2.

5   I wanted to just confirm a couple of things.  The

6   projection of annual revenue, this 296 million-dollar

7   figure, was taken from your review of revenue with respect

8   to Sinovel from the 2009 through 2011 time period; is that

9   my understanding?

10  A.   It's through our fiscal -- what was reported in our

11  fiscal 2009 and 2010 annual reports.

12  Q.   Okay.  And you're aware that after that period of

13  time and for the next ten years, the Chinese wind power

14  market went through a bust cycle; isn't that fair to say?

15  A.   If you say so.  I didn't do an extensive analysis, so

16  I have no comment on that.

17  Q.   But you've worked with AMSC for years.

18  A.   I have, but this is a different matter here.  This is

19  a simple -- your client did not take shipments under a

20  contract.  A contract is a contract and you're sitting

21  here saying that it's a market-based issue.

22           THE COURT:  Let's not argue --

23           THE WITNESS:  All right.  Fine.

24           THE COURT:  -- between counsel.

25  A.   Whether there was a market downfall or not --

57

1           THE COURT:  When I'm talking, you have to stop.

2           THE WITNESS:  Okay.

3           THE COURT:  Answer his questions.  If you don't

4  know, that's a perfectly acceptable answer.

5           THE WITNESS:  Okay.  I don't know.  I'm sorry,

6  Your Honor.

7  BY MR. AGOGLIA:

8  Q.   And in fact 2009 through 2010 would be the boom years

9  for the Chinese wind power market; isn't that correct?

10  A.   They may have been.

11  Q.   And you took the revenue that you projected from both

12  actual sales and this imputed sales from the additional

13  rejected shipments and then you ran those out for an

14  assumed ten-year future period, correct?

15  A.   That's correct.

16  Q.   So it assumes that that level of activity would have

17  continued at least through that ensuing ten years; fair to

18  say?

19  A.   That's what it says.  That's correct.

20  Q.   On this question of the IP value, are you aware that

21  Sinovel paid AMSC millions of dollars to develop the IP

22  for the programmable logic controller and PM converter

23  components in a free-standing development agreement some

24  years prior to 2009?

25  A.   I'm not aware.

58

1   Q.    Are you aware that in that development agreement for

2   which Sinovel paid millions of dollars -- there's a

3   development agreement for 1.5 and for 5 megawatt machines

4   that have come into this court's evidence at trial -- that

5   AMSC agreed to provide the IP, the controlling IP, for

6   those components, quote, "free of charge"?

7   A.    I understood --

8         MR. O'SHEA:  Your Honor, those contracts said

9   that American Superconductor --

10        MR. AGOGLIA:  Can we --

11        MR. O'SHEA:  -- always retained the source code.

12  We don't need to go through that again.

13        THE COURT:  I'm going to take that to be a

14  relevance objection.  And as long as you keep this

15  questioning short, I'll let you go.  I'll overrule the

16  relevance objection.  You can get into it.  We are getting

17  a little far afield here.

18        MR. AGOGLIA:  Okay.  Would you reread the

19  question for Mr. Samia, please?

20      (Record read.)

21  A.    We never provided the rights to source code.

22  Q.    The 25% IP value was for the software that would come

23  with your components if there had been this ten-year

24  period of purchases and sales, correct?

25  A.    Correct.

1  Q.   And that IP wouldn't have been source code, correct?

2  A.   Correct.

3  Q.   Okay.

4  A.   But -- go ahead.

5  Q.   And for that IP, it's correct, isn't it, that AMSC

6  had agreed to provide that IP, the non-source-code IP,

7  that would come with your components if a ten-year period

8  of ongoing boom-time commercial activity continued free of

9  charge under the existing agreements?

10 A.   Let me clarify something on this analysis.  What this

11 analysis assumed was if we no longer -- because Sinovel

12 had our source code, because they had our IP, what would

13 the cost of that be because they would no longer need our

14 components, so you're mischaracterizing this.

15      This was if we no longer had shipments to them, if

16 they had all the source code, which they didn't have a

17 legal right for, what would we charge them.  That's what

18 this was looking at.

19      We never gave them the right to the source code under

20 any contracts.  That's the value.  Then they can

21 manipulate the parameters.  We never gave them those

22 rights.  So that's what this analysis was trying to do.

23 If we no longer --

24           THE COURT:  That's okay.

25           THE WITNESS:  Thank you.

1          THE COURT:  I understand his perspective and I

2    understand your point about it, too.

3          MR. AGOGLIA:  Okay.

4    BY MR. AGOGLIA:

5    Q.    Did AMSC ever, to your knowledge, enter into a

6    licensing agreement for the IP that we're talking about,

7    the LVRT-specific IP, with any other customer?

8    A.    Not to my knowledge.  I don't recall.  I don't

9    recall.  I'm sorry.  Could you clarify, actually clarify

10   the question?

11         THE COURT:  Did you ever just license the

12   software?

13         THE WITNESS:  Not that I'm aware, but I don't

14   know.  I haven't done an exhaustive list of the contracts,

15   to be honest with you.

16   BY MR. AGOGLIA:

17   Q.    I thought you used the phrase, when responding to the

18   judge's questions at one point, that there may have been

19   a, quote, "modest license fee" relating to this same IP.

20   Did I remember -- did I hear you correctly?

21   A.    What I was just answering was the bundling that we

22   were talking about in terms of we didn't price the license

23   of 200 million for the license and 500 million for the

24   product.  That's all I said.  That's all I was responding

25   to.

1  Q.   The *Lost gross margin approach* here again assumes a

2  ten-year going forward commercial enterprise at the robust

3  levels of the 2009 to 2010 time period; is that fair to

4  say, if I understand what you've done here?

5  A.   That's correct.

6        MR. AGOGLIA:  Your Honor, we have no further

7  questions for Mr. Samia.

8        THE COURT:  Any redirect?

9                REDIRECT EXAMINATION

10 BY MR. O'SHEA:

11 Q.   I'm going to turn your attention to -- I'm sorry.

12 Yeah, if we can get that.  When we met in Devens,

13 Massachusetts, you provided me a series of contracts; is

14 that correct?

15 A.   Correct.

16 Q.   And one of those is now marked as one page of

17 Government Exhibit 22F, page 8.  And like all the other

18 development contracts, it clearly indicates that the

19 rights to the source code remains with Windtec and that

20 was a subsidiary of American Superconductor, right?

21 A.   That's correct.

22        MR. O'SHEA:  Nothing further.

23        THE COURT:  All right.  Very good.  Thank you,

24 Mr. Samia.

25        THE WITNESS:  Thank you.

1          (Witness excused at 10:23 a.m.)

2              MR. O'SHEA:  Mr. Deane, please.

3              MR. AGOGLIA:  The witness has asked and we have

4   agreed that they may stay.

5              THE COURT:  After their testimony?

6              MR. AGOGLIA:  Yes.

7              THE COURT:  Okay.

8          **GORDON DEANE, GOVERNMENT'S WITNESS, SWORN**

9                      DIRECT EXAMINATION

10  BY MR. O'SHEA:

11  Q.   Mr. Deane, could you state your name and spell your

12  last name?

13  A.   Gordon Lewis Deane, D-E-A-N-E.

14  Q.   What do you do for work?

15  A.   I work for Palmer Management and Palmer Capital

16  Corporation.

17  Q.   And through a series of entities, have you invested

18  in wind turbines in Scituate and Fairhaven, Massachusetts?

19  A.   Yes.

20  Q.   Did you submit, and you can see this to your left, a

21  statement that was provided to the probation office

22  summarizing losses you feel were triggered by your

23  dealings with Sinovel?

24  A.   Yes, I did.

25  Q.   And we're going to go through those statements.  And

1   as you know, the government supports some of your claims

2   and the government does not support other of your claims;

3   do you understand that?

4   A.   I do.

5   Q.   You, with your business associate, Sumul Shah, bought

6   wind turbines in Scituate, Massachusetts, Fairhaven, and

7   then you were also somewhat involved in a wind turbine

8   erected in Charlestown, Massachusetts; is that correct?

9   A.   Yes.  I was peripherally involved.

10  Q.   Say that again?

11  A.   I was peripherally involved.  I provided a bridge

12  loan to get the turbines from China to the U.S. because

13  the MWRA would not pay for the charges to deliver in the

14  country.

15  Q.   And MWRA stands for Massachusetts --

16  A.   Massachusetts Water Resources Authority.

17  Q.   And they were the purchaser of the Charlestown

18  turbine?

19  A.   Yes.

20  Q.   Before any of the turbines were commissioned, did

21  Sinovel provide a statement to you and to Mr. Shah

22  claiming that the American Superconductor's intellectual

23  property claims were unfounded and that Sinovel had

24  developed the LVRT solution itself?

25  A.   I don't recall them saying they developed the

64

1   solution themselves.  But they did say that the claims

2   against them were unfounded, yes.

3   Q.   Had you known that the turbines contained stolen

4   software, would you have purchased the turbines?

5           MR. AGOGLIA:  Objection.  Relevance.

6           THE COURT:  Overruled.

7   A.   No.  Our contract specifically called for AMSC

8   equipment.

9   Q.   Why so?

10  A.   Because that's what Sinovel represented it was

11  selling to us and we were -- our exhibits specifically

12  refer to AMSC software and AMSC equipment.

13  Q.   But that reference was not -- I want to make sure

14  we're speaking clearly to each other and make sure you

15  understand.  Had you known that the turbines -- had you

16  known that they contained stolen software, would you have

17  purchased the turbines from Sinovel?

18  A.   No.

19  Q.   Let's explore -- and this is a longer statement

20  that's summarized within the presentence report.  I'm

21  going to -- and I've taken the liberty of highlighting

22  certain parts, but I'm going to go to page 6 and ask you

23  to just explain how the losses relate to Sinovel's crimes.

24  And I'll ask you the same question as it relates to both

25  Scituate Wind and Fairhaven Wind.  The first thing is the

1   *Past Due Availability Liquidated Damages*.   How do those

2   claims relate to Sinovel's crimes?

3   A.   Well, if I could back up a little bit.

4   Q.   Sure.

5   A.   We had entered into both a Turbine Supply Agreement

6   for each of the project companies.   Scituate Wind and

7   Fairhaven Wind entered into a Turbine Supply Agreement

8   with Sinovel.   We also entered into a Maintenance Service

9   Agreement which required them to operate and maintain the

10  equipment for five years.

11      The Turbine Supply Agreements had an availability

12  guarantee in them.   And when --

13  Q.   And when you say "availability guarantee," what does

14  availability mean?

15  A.   Availability means the equipment is available to

16  operate basically when the wind is blowing.   An

17  availability guarantee has a lower availability guarantee

18  for the first three months, a higher availability for the

19  next three months, and then a 95% availability requirement

20  thereafter.

21  Q.   All right.   And that was what Sinovel guaranteed in

22  the purchase agreement for these turbines?

23  A.   Correct.

24  Q.   So when the wind is blowing, the turbine was going to

25  create electricity, after a period of time, 95% of the

 1 | time?

 2 | A.   Yes.

 3 | Q.   Okay.  And then was the availability -- did they meet

 4 | their standards while the maintenance crew was there?

 5 | A.   While Sinovel was there and operating the equipment,

 6 | they were very close, in the 93, 94 percent -- I think I

 7 | have it in here in the text -- 93- or 94-percent

 8 | availability.  And again this is, you know, early in the

 9 | operations of the equipment.

10 | Q.   All right.  And then at some point Sinovel was

11 | charged with crimes.  They pulled, simultaneously, they

12 | pulled all their maintenance folks out of Massachusetts;

13 | is that your understanding?

14 |         MR. AGOGLIA:  Objection.  Leading.

15 |         THE COURT:  It's a little bit leading, but I

16 | don't think it's substantially in dispute.  Overruled.

17 | Go ahead.

18 | A.   Yes.  When the Department of Justice filed a lawsuit

19 | against them, they very promptly pulled their people out

20 | of the Boston area, leaving us with no one to operate the

21 | equipment initially.

22 | Q.   And did that influence the availability?

23 | A.   Yes.

24 | Q.   How so?

25 | A.   Well, on a numerical basis, the availability went

1  from, you know, in the low 90s to in the 70s, 70%

2  available.  Sinovel did contract with another operator,

3  but the operator obviously wasn't familiar with the

4  equipment and also wasn't getting support from Sinovel in

5  China to try to maintain the equipment.  So the

6  availability went way down, which affects the revenue

7  stream for the projects.

8  Q.    And for Scituate, the lower availability, that would

9  be the figure of 468,000, for Scituate?

10 A.    Excuse me.  The lower availability, the 468?

11 Q.    Yeah.

12 A.    Yes.  As I said, the Turbine Supply Agreement has a

13 specific provision for availability and it has an exhibit,

14 Exhibit H of the Turbine Supply Agreement, which

15 calculates what the damages will be based upon the

16 availability.  And these numbers in this report is

17 straight from Exhibit H applying the formulas in

18 Exhibit H.

19 Q.    Okay.  The formulas that you and Sinovel had agreed

20 to?

21 A.    Yes.

22 Q.    Okay.  I see Fairhaven is not quite twice as much,

23 816,000 for the availability damages.  Is it twice as much

24 because there are two turbines there at Fairhaven?

25 A.    That's pretty much it, yes.

1  Q.   Okay.  Tell me about the *Past Due Increased O&M*

2  *Costs*.  First of all, what is O&M?

3  A.   O&M is operation and maintenance.  As I mentioned, we

4  entered into five-year maintenance service agreements with

5  Sinovel.  They pulled their people out.  They stopped

6  maintaining the turbines.  While they contracted with

7  Gemini Energy Services, they were not providing support to

8  Gemini Energy Services and Gemini didn't really know how

9  to operate these particular turbines.

10      And then Sinovel stopped paying Gemini, so obviously

11  Gemini stopped working.  We had to hire Gemini Energy

12  Services.  And we subsequently replaced them with another

13  operator, Baldwin, which is -- so we incurred these

14  additional costs above and beyond the contracted-for costs

15  that would have been paid to Sinovel under the terms of

16  the Maintenance Service Agreement.

17  Q.   Okay.  All right.  And that is 225,000 for Scituate

18  and 478,000 for Fairhaven; is that right?

19  A.   Yes.

20  Q.   Okay.  And the next is we've got *Cost of Parts &*

21  *Supplies*.  What is that?

22  A.   The Maintenance Service Agreement requires that at

23  the end of the five-year period, any parts that had been

24  used, Sinovel would restock so that we would have the same

25  inventory of spare parts at the end of the five-year

1   period as we started with.

2       Now, what we did, to be fair, is when we incurred

3   extra O&M costs for parts, we did not double count it in

4   the spare parts that were then missing.

5   Q.   And the other parts here that are not highlighted,

6   you may disagree, but the government took the view that

7   those were not countable for purposes of the guidelines,

8   so that's just our view.  But at the same time, you've got

9   *Damage Offsets Taken* here.  And what are the damage

10  offsets?

11  A.   The terms of the Turbine Supply Agreement require

12  that Sinovel put up a letter of credit equal to 10% of the

13  value of the equipment to support their obligations.  They

14  originally put one up for the Scituate Wind turbine.  They

15  could not get one for the Fairhaven Wind turbine.  The

16  Scituate one, they could not renew them, so it got old.

17  We had that cash.  Under the terms of the supply

18  agreement, we had an interest in that short presentation.

19  We gave them credit for the fact we were holding those

20  funds.

21  Q.   Okay.  However, clearly the United States suggests

22  that the Court should not allow certain costs and it

23  follows that those offsets are applied here and they're

24  not subtracted off again because those offset credits, the

25  United States would suggest, should be applied to the

1    disallowed losses, not the allowed losses.

2        We'll get to the numbers at the bottom.  Tell us

3    about the *Projected Future Damages* and how those are

4    calculated.  First, let's start with the *Lost Revenue due*

5    *to Lower Availability*.

6    A.   Well, based upon how things have operated since

7    Sinovel left, how we got to our availability liquidated

8    damages for the damages to date, we projected that that

9    availability would continue, that lower availability would

10   continue, into the future.  And we did the same thing with

11   increased O&M costs which had been substantially higher:

12   We projected those higher O&M costs into the future.

13   Q.   And how far into the future did you project those?

14   A.   In terms of the service agreement for five years, a

15   reasonable life of wind turbines would be 20 years,

16   probably 25 or 30, but we protected just for 15 years

17   going forward.

18   Q.   15 years?

19   A.   Yes.

20            THE COURT:  But the contract for maintenance that

21   you had was only for five years.

22            THE WITNESS:  Yes.  Correct.

23   BY MR. O'SHEA:

24   Q.   But do you take the view that the lower availability

25   stems in part from the fact that -- in the future it stems

```
 1   from the fact that Sinovel abandoned the maintenance
 2   contracts?  And, if so, please explain why that's your
 3   belief.
 4   A.   As I said, when Sinovel was -- had their people there
 5   and they were actually operating the equipment, we had
 6   availabilities in the 90s.  When they pulled out, the
 7   availability dropped into the 70s.  That's just the way --
 8   just what happened.  And it's been hard to get the
 9   availability back up because of the lack of support from
10   Sinovel.
11       Over the years we have had many discussions with
12   them.  We've talked about settling.  We were not able to.
13   So these are the damages that's calculated in the
14   contracts.
15   Q.   Because Sinovel abandoned suddenly, did you have any
16   opportunity to have them support or train a new
17   maintenance team?
18   A.   No.
19   Q.   And has Sinovel been of assistance to help with
20   replacement parts, and so on, for their idiosyncratic
21   turbines?
22   A.   No.
23   Q.   As a result, have you and your colleagues had to sort
24   of jimmy around with the different parts, different
25   software, trying to keep these turbines working?
```

1  A.    Yes, we have.

2  Q.    And do you believe the lower availability is

3  essentially a residue of Sinovel's abandonment of your

4  turbines?

5  A.    Yes, I do.

6  Q.    You also have *Increased O&M Costs to be Incurred*.

7  Could you explain why you believe those would go forward

8  into the future as well?

9  A.    Again when Sinovel was operating, they had people

10  here who were trained on those wind turbines.  They knew

11  them inside and out and they knew how to keep them running

12  and they knew how to keep them operating at a reasonable

13  cost.  That has been a challenge for us.  I think in the

14  write-up we talk about how O&M costs have been two to four

15  times as much as we'd contracted for.

16       If Sinovel had not abandoned the project, pulled its

17  people out, we expect that we would have continued to keep

18  them operating and maintaining the equipment and giving us

19  both higher availability and lower O&M costs.  And from

20  our perspective, from owners-of-wind-turbine's

21  perspective, it's a double whammy: We have less production

22  and we have a lot of operating costs.  We have to make a

23  dime on financing these projects.

24  Q.    So the number at the bottom there, the 12,411,541, is

25  that the cumulative amount of those -- all the numbers

1   that the United States suggests should be included as your

2   losses?

3   A.    Those are the direct costs for Scituate Wind and

4   Fairhaven Wind and ignoring our legal costs, the other

5   costs we put in or, you know, other parties that had

6   damages as a result of this action and we've been told

7   that we can't really submit those.  So for the damages,

8   aside from legal costs that Scituate Wind and Fairhaven

9   Wind occurred, yes, that's a reasonable number.

10          MR. O'SHEA:  The United States moves in

11   Government Exhibit S3.

12          THE COURT:  Any objection?

13          MR. AGOGLIA:  Your Honor, just for the record,

14   we've never seen this before and it's not for want of

15   asking for this type of material.  And just from a quick

16   check, I'm not sure it all tracks through to the same

17   numbers in the presentence report, so we --

18          THE COURT:  Maybe I'll just ask Mr. O'Shea to

19   explain to me how this document was used.  I gather

20   Mr. Williams had this when he did the presentence report?

21          MR. O'SHEA:  Yes, I believe this was provided to

22   Mr. Williams.  I understand that Mr. Williams summarized

23   this and included this information in the presentence

24   report.

25          THE COURT:  And was it given to Mr. Agoglia and

1   his team at the same time?

2         MR. O'SHEA:  Only through the presentence report.

3   I understood that this information was communicated

4   through the presentence report.

5         THE COURT:  Okay.  So Mr. Williams had it and

6   Mr. Agoglia didn't have it?

7         MR. O'SHEA:  That's only through the presentence

8   report.  That's all I understood, that that information

9   was communicated.

10        MR. AGOGLIA:  And to be clear, and the government

11  had it.

12        THE COURT:  Well, yeah.  I'm going to receive it.

13  I have my misgivings about it and I don't know why

14  Mr. Agoglia didn't get a copy of it.

15        MR. O'SHEA:  I believe, as I say, I believe it

16  was communicated through the presentence report.

17        THE COURT:  Well, I get it, it's paraphrased in

18  that.

19        MR. O'SHEA:  Yeah.

20        THE COURT:  But usually the criminal discovery

21  that the probation office works from is provided to the

22  defense.

23        MR. O'SHEA:  Right.  Yeah.  This was something

24  created for the presentence report writer.

25        THE COURT:  Mm-mm.  All right.  Okay.  Go ahead.

1   So you're finished, Mr. O'Shea?

2            MR. O'SHEA:  Yeah.

3            THE COURT:  Okay.  Cross-examination.

4            MR. AGOGLIA:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6   BY MR. AGOGLIA:

7   Q.   Mr. Deane, the five-year contract with Sinovel for

8   maintenance began sometime in 2011; is that correct?

9   A.   It began in 2012.  I think it was probably April for

10  Scituate and May for Fairhaven.

11  Q.   And did I understand you correctly to say that this

12  third-party vendor, Gemini, who did some of the work at

13  the turbines on-site, was the vendor that had originally

14  been working on the turbines through the Sinovel

15  maintenance contract?

16  A.   Well, no.  Actually, Sinovel had its own people

17  stationed in the Boston area and they were operating and

18  maintaining the wind turbines, then they pulled their

19  people out and contracted with Gemini Energy Services to

20  provide O&M services.

21  Q.   Sinovel contracted --

22  A.   Gemini was a subcontractor to Sinovel.

23  Q.   -- Sinovel contracted to have that company provide

24  those services in their absence; do I understand that

25  correctly?

1   A.    Yes.

2   Q.    And you made the choice to replace them at some point

3   because you didn't think their work was as good as it

4   should be; is that fair to say?

5   A.    Well, when Sinovel stopped paying Gemini, Gemini

6   stopped working.  So since Gemini had some experience with

7   the wind turbines, we hired them to be an operator, and

8   then we subsequently replaced them with a different

9   operator.

10  Q.    When, sir, if you know, did Sinovel stop paying

11  Gemini for the purpose of maintaining your turbines in

12  Massachusetts?

13  A.    I'm not familiar with all the back-and-forth between

14  Gemini and Sinovel.  My belief is they stopped being paid

15  sometime in early 2014.  And they were then realizing they

16  weren't going to get paid in, say, October, November that

17  year and that's when they quit operating.

18  Q.    Did Sinovel have disputes with your organization, the

19  owners of the wind turbines, about the failure to make

20  payments it believed were due under your contracts with

21  Sinovel?

22  A.    Could you rephrase that?  I'm sorry.

23  Q.    Yes.  Happy to.  Was it the case, Mr. Deane, that

24  Sinovel, as you understood it, believed that you were not

25  making payments that were actually due under the contracts

1   relating to the maintenance of your wind turbines?

2   A.   We were withholding payment from Sinovel, in

3   accordance with the Turbine Supply Agreement, to enforce

4   their guarantees.  And we had -- we sent them several

5   default notices saying that "This is the amount that we

6   owe you.  This is the amount you owe us.  Can we settle

7   that?"  And it never got settled.

8   Q.   Is it the case that all of these disputes -- the

9   disputes about what Sinovel believed you owed, what you

10  believed Sinovel owed you -- your claims for damages have

11  now been finally resolved?

12  A.   These amounts have not been resolved.  We have

13  entered into a settlement agreement.  I believe it's been

14  provided to the Department of Justice and to the Court.

15  We have entered into a settlement agreement with Sinovel

16  as a result of this matter, yes.

17  Q.   Okay.  And you have asked for your statement to be

18  provided to the Department of Justice in this matter about

19  those agreements to be submitted to the Court; is that

20  correct?

21  A.   Yes, in accordance with the terms of the settlement

22  agreement.

23  Q.   And is it correct that those agreements provide that

24  upon receipt of the agreed-upon settlement payment from

25  Sinovel to you and the other Massachusetts wind turbine

1  operators who have made victim statements here that that

2  payment would be for, quote, "all economic loss directly

3  or indirectly related to any dispute between the parties,

4  including all claims for restitution or harm to the

5  customers arising directly or indirectly from Sinovel's

6  conduct which is the subject of the *United States v.*

7  *Sinovel* criminal action"?

8  A.   If you're reading from the notice I provided or from

9  the settlement agreement itself, yes.

10  Q.   I'm representing, sir -- this is not meant to be a

11  memory test.  I represent that that is, I submit, a

12  faithful reading of your statement and that faithfully

13  captures what you understood you to have resolved.

14  A.   Yes.

15          MR. AGOGLIA:  I have no further questions, Your

16  Honor.

17          THE COURT:  Redirect.

18                    REDIRECT EXAMINATION

19  BY MR. O'SHEA:

20  Q.   You didn't provide me the actual settlement itself,

21  but rather your statement, as you're required to do under

22  that settlement; is that correct?

23  A.   That's correct.

24  Q.   And you understand that I provided that statement to

25  Mr. Williams, as an arm of the Court?

1  A.   I assume so, yes.

2  Q.   Okay.  And then you are to receive, under that

3  agreement, $850,000, is that right, that you'll divide

4  among all the Massachusetts turbine owners affected?

5  A.   Yes.  The funds that will be coming out in Chinese

6  currency and converted, and fees for conversion and

7  everything else, but it's approximately that amount, yes.

8  Q.   And you are optimistic that that financial

9  transaction is in the works now?

10  A.   I received a notice, written mostly in Chinese, this

11  morning which had 850,000 in it.  And it had a similar

12  amount, or it had an equivalent amount I guess, in R and D

13  in it.  It had an account in Hong Kong listed.

14       It did not have our account in Cambridge Savings Bank

15  listed, that I could tell.  And I've been in

16  correspondence with Cambridge Savings Bank several times

17  this morning.  As of before I just now walked in here,

18  those funds have not yet been received at the account in

19  Cambridge Savings Bank.

20            MR. O'SHEA:  All right.  Nothing further.

21            THE COURT:  Very good.  Thank you.

22            MR. AGOGLIA:  Just one clarification about the

23  payment, Your Honor.

24

25

80

1                    RECROSS-EXAMINATION

2   BY MR. AGOGLIA:

3   Q.   Mr. Deane, you understand that the agreed-upon

4   amounts for restitution and other harm you may have

5   suffered as a result of Sinovel's conduct has been

6   transferred to a Bank of America account in its Hong Kong

7   location?

8   A.   From the account number, yes.  Again I can't read the

9   Chinese.  But I think from the account number, yes, it's a

10  Bank of America account.

11  Q.   The Bank of America account number indicates a B of A

12  account number, correct?

13  A.   I assume so again from the account number.

14  Q.   Do you have any reason -- you understood that there

15  would need to be sort of an intermediary financial

16  institution to transfer the funds from China to your

17  specified account in Massachusetts?

18  A.   Yes.

19  Q.   So do you have any reason to doubt that the funds --

20          THE COURT:  I think I get it: The check is in the

21  mail.  All right.  Thank you.  Next witness.

22      (Witness excused at 10:50 a.m.)

23          MR. O'SHEA:  Next is Mr. Shah.  And Mr. Wiseman

24  was going to give him a call.

25      (Discussion held off the record.)

1          MR. O'SHEA:  Mr. Shah, this is Tim O'Shea.

2   You're here in court.  I will ask the court reporter to

3   administer the oath.

4          **SUMUL SHAH, GOVERNMENT'S WITNESS, SWORN**

5                    DIRECT EXAMINATION

6   BY MR. O'SHEA:

7   Q.   Mr. Shah, state your name and spell your last name.

8   A.   My name is Sumul Shah.  Last name is Shah, S-H-A-H.

9   Q.   And, Mr. Shah, you testified at the trial in January;

10  is that correct?

11  A.   That's correct.

12  Q.   I'll skip over your background.  You were involved in

13  the purchase of the Charlestown turbine; is that correct?

14  A.   That's correct.

15  Q.   And I sent you the other day, Government Exhibit S4.

16  Have you had an opportunity to look at that?

17  A.   I have.

18  Q.   And we're just going to talk about one figure on the

19  last page and that is a *Charlestown Wind Maintenance Issue*

20  for $77,879.76.  Can you explain -- we've already had some

21  maintenance testimony on this point, so we're not going to

22  develop it a great deal.  But could you explain why you

23  think the *Wind Maintenance Issue* is related to the crimes

24  in this case?

25  A.   We had -- so the Charlestown Wind turbines, we were

 1    under contract with Sinovel to provide maintenance of the

 2    turbines for a two-year period.  That two-year period

 3    ended in October of 2013 as a result of the issues

 4    involved in this case.  Sinovel withdrew from the United

 5    States and stopped servicing the turbines in Charlestown.

 6        Because we still had a contract with our customers to

 7    fulfill maintenance obligations through October of 2013,

 8    we used a combination of our own people, plus hired an

 9    outside vendor, Gemini Energy Services, to fulfill the

10    obligations that Sinovel had under their maintenance

11    agreement.

12            MR. O'SHEA:  All right.  Okay.  That is it.  I

13    will notice that -- I would move in Government Exhibit S4

14    and observe that that statement is fulsomely summarized,

15    almost word for word, in a presentence report, the

16    original presentence report and in the revised presentence

17    report, although the revision has some commentary in there

18    beginning at paragraph 49.

19            THE COURT:  Very good.  All right.  Mr. Agoglia,

20    do you want to be heard on S4; any objections on S4?

21            MR. AGOGLIA:  We have the same objection, Your

22    Honor.  We were never provided with a copy of this

23    statement and so do object to its use in this proceeding.

24    I think I may have one or two questions for Mr. Shah about

25    this figure.

1          THE COURT:  I'll give you a chance.  I'll receive

2  the -- your objection is noted.  It concerns me a little

3  bit, but I'll receive it for purposes of my work here and

4  then you can do your cross-examination.

5                      CROSS-EXAMINATION

6  BY MR. AGOGLIA:

7  Q.   Mr. Shah, this is Michael Agoglia on behalf of

8  Sinovel.  This $77,879.76 line item is in fact payments

9  that you made to Gemini, the vendor who you used after the

10  expiration of the Sinovel contract in October of 2013;

11  isn't that correct?

12  A.   No.  This is payments that we made to Gemini to get

13  us through October of 2013.

14  Q.   Okay.  So it was just for the month of October 2013?

15  A.   No.  It was from the time that Sinovel withdrew their

16  forces from the United States through October 2013.  I

17  believe they withdrew in June of that year, so it was for

18  the time period from June through October.

19  Q.   Isn't it the case that Sinovel had arranged for

20  Gemini to do the maintenance in its absence?

21  A.   This is the amount that Lumus paid Gemini.  I don't

22  believe that Gemini was paid by Sinovel for their

23  services, so Gemini then sought payment directly from us,

24  which we paid.

25  Q.   My question is a little bit different, Mr. Shah.

84

1  Isn't it true that Sinovel arranged for this vendor to

2  come in and do the maintenance services in its absence?

3  A.   I believe that's correct.

4  Q.   Okay.  And you would have had to pay Sinovel

5  compensation for providing the same services; isn't that

6  correct?

7  A.   The compensation to Sinovel was part of -- was part

8  of the Maintenance Supply Agreement -- Maintenance

9  Services Agreement, that was signed after the Turbine

10  Supply Agreement.  So it was, in total, part of the

11  overall contract with Sinovel.

12  Q.   I'm sorry.  I'm not sure I'm understanding.  Let me

13  try to break it down.  Did you have to compensate Sinovel

14  for any maintenance work that was done during the time

15  period that you say Gemini stepped in in Sinovel's

16  absence?

17  A.   Yes.  Sinovel would have been paid for their

18  maintenance services as part of the overall agreement that

19  we had.

20  Q.   I'm sorry.  That was a payment that you had made all

21  up front?

22  A.   No.  It was a payment that we had made in various

23  installments.

24  Q.   And so we're clear on the record, is it your

25  testimony that you paid Sinovel compensation for work that

1  it had not done with respect to the maintenance of the

2  Charlestown turbine after it withdrew from the United

3  States?

4  A.   We paid Sinovel for work that it has not done.

5  Q.   Okay.  And how much did you pay Sinovel for any

6  maintenance that was to have occurred or that did occur

7  during this period which you roughly placed between June

8  of 2013 and October of 2013?

9  A.   I don't have the numbers in front of me.

10  Q.   Did the amount you paid Gemini reflect a market rate

11  for their services in maintaining the Charlestown turbine?

12  A.   The amounts that we paid Gemini were based on time

13  and materials.  So they had to document the time that they

14  spent performing the maintenance services as well as any

15  material costs and that amount was calculated by Gemini.

16  Q.   Right.  And is it fair to say that's a fairly

17  standard way of compensating people for their maintenance

18  work?

19  A.   No.  Typically we sign a lump-sum contract to cover

20  all the maintenance work.

21  Q.   Was the 77,879-dollar compensation fair for the work

22  that Gemini had done?

23  A.   Yes.  It represented fair value for the work they had

24  performed.

25            MR. AGOGLIA:  Okay.  I have no further questions,

 1   Your Honor.

 2             THE COURT:  Okay.  Any redirect?

 3             MR. O'SHEA:  Yes.

 4                    REDIRECT EXAMINATION

 5   BY MR. O'SHEA:

 6   Q.   Just to be clear, did Sinovel abandon the Charlestown

 7   maintenance agreement without providing a new vendor?

 8             MR. AGOGLIA:  Objection.  Asked and answered.

 9             THE COURT:  No.  Go ahead.  Overruled.

10   A.   Sinovel did arrange for Gemini to perform maintenance

11   work.  However, they -- it was ultimately not paid, so we

12   ended up paying Gemini for their maintenance work.

13   Q.   Okay.  Let's break this into parts.  So, first of

14   all, let's just get back to the question I asked.  Did

15   Sinovel abandon the maintenance agreement without

16   selecting a new vendor?

17             MR. AGOGLIA:  Objection.  Asked and answered.

18             THE COURT:  Overruled.

19   A.   At the time that Sinovel abandoned the Charlestown

20   turbine, there was no vendor -- no replacement selected.

21   Q.   And eventually you helped arrange Gemini; is that

22   correct?

23   A.   That is correct.

24   Q.   And you had to pay Gemini when Sinovel did not pay

25   Gemini; is that correct?

87

1   A.   That's correct.

2   Q.   And does the 77,000-plus indicate the amount you paid

3   to Gemini above and beyond an amount you had provided to

4   Sinovel for Sinovel to perform the maintenance agreements?

5   A.   That's correct.

6          MR. O'SHEA:  Nothing further.

7          THE COURT:  All right.  Very good.  Thank you,

8   Mr. Shah.

9          THE WITNESS:  Thank you.

10      (Witness excused at 11 a.m.)

11          THE COURT:  All right.  Okay.  So, Mr. O'Shea,

12   those are your four witnesses; is that correct?

13          MR. O'SHEA:  That's it.

14          THE COURT:  All right.  Let's take a ten-minute

15   break and then we can reconvene and we can then figure out

16   what we're going to do with this and proceed with the rest

17   of the sentencing.  So ten minutes, so that's 12 minutes

18   after 11.

19      (Recess at 11:02 a.m. until 11:12 a.m.)

20          THE COURT:  All right.  Mr. O'Shea, what's next?

21          MR. O'SHEA:  Well, what is left to do is to talk

22   about the other guidelines disputes.  Loss obviously would

23   be the biggy.  And we'll just generally argue about the

24   sentence to be imposed.  We'll talk about the probation

25   conditions and the amount of the fine.  The timing of the

1    fine is still at issue.  And then at some point the Court

2    will advise of appellate rights and we'll talk about

3    whether they should escrow the fine and the Court can --

4              THE COURT:  All right.  So as I see it, the loss

5    amount under the guidelines is really the issue.  And

6    again I continue to believe that the guideline calculation

7    really is an academic exercise here at this point.  But

8    the Court of Appeals likes it when I do the guideline

9    calculations, so I'm going to do it.

10       So with the loss amounts, one of the central

11   conundrums presented in this case is the difference

12   between the losses that are properly recognized as losses

13   under the guidelines, direct losses that are recoverable

14   as restitution, and then a set of consequential losses

15   that are neither.  In a lot of cases, that distinction

16   between the consequential losses and the recoverable

17   losses kind of fall into nice neat bundles and it's not

18   that complicated.

19       But here, given the circumstances of this case in

20   that we have this theft of the trade secrets and the

21   copyright infringement as well as the wire fraud happens

22   to be so intimately related with the business relationship

23   between the two parties here that drawing that line

24   between the consequential losses and all the others is

25   complicated, to say the least.

1        But start me out with this at least: Tell me what

2   the -- help me understand the difference between the

3   losses that I can recognize under the loss calculation

4   under the guidelines and the restitution amounts.  So I

5   think I have a generally good idea about the basic

6   principles involved in the direct versus consequential

7   losses for restitution purposes, but the loss amount

8   calculation under the guidelines is somewhat broader than

9   the amounts recoverable as restitution.

10       So what else can I throw into the loss amount that I

11  can't in restitution?

12            MR. O'SHEA:  Okay.  The big thing is something --

13  well, we don't have to -- well, the big thing we don't

14  have to worry about is that oftentimes the big difference

15  between 2B1.1 loss in restitution is intended loss.  We

16  don't have to worry about intended loss in the context of

17  restitution, not so much of a factor here because all the

18  losses, the United States respectfully submits, are actual

19  losses.  Okay.  So that's it.

20       The other thing is I'm not asking the Court to make a

21  restitution finding at all.  The Court -- I'm asking the

22  Court to require, for purposes of probation, Sinovel to

23  pay the next $25 million to American Superconductor and to

24  pay the $850,000 -- it looks like it's on the way -- to

25  Massachusetts turbine owners.

1            THE COURT:  Yeah.

2            MR. O'SHEA:  If Sinovel doesn't pay the next

3    installment of $25 million, then we'll argue about how

4    that all breaks down based on the facts that have been

5    developed.

6            THE COURT:  Okay.

7            MR. O'SHEA:  So really I think we're just talking

8    about losses here, actual losses, and there are different

9    ways to think about the actual losses.  And they mostly

10   break down, as we've explored here, the market is, I

11   respectfully submit, the simplest way to do it, because if

12   the market is ultimately informed a year later, at that

13   point the market knows that not only has Sinovel broken up

14   with American Superconductor, but they've stolen their

15   trade secrets.  So I think that the one-year is the

16   simplest, easiest way to encapsulate all of the losses and

17   that's perfectly appropriate under the guidelines.  So I

18   suggest that the market loss --

19           THE COURT:  Help me understand why -- it seemed

20   to me that the guidelines suggested, in a trade secret

21   case, what I really should look at is the diminishment of

22   the value of the trade secret.  This is not just a trade

23   secret case.

24           MR. O'SHEA:  Right.

25           THE COURT:  I recognize that and it has some

1   important consequences for us.

2          MR. O'SHEA:  Right.

3          THE COURT:  But looking at it just from the

4   prospective of a trade secret case, the question before me

5   is what was the trade secret that was misappropriated

6   worth.

7          MR. O'SHEA:  Yeah.

8          THE COURT:  One way to look at it is the way

9   Mr. Agoglia advocates and that is it's the development

10  cost.  And nobody seems to be really enthusiastic about

11  this.  Mr. Agoglia hasn't put in evidence of it.  You

12  haven't put in evidence of it.

13      I think you are convinced that the development cost

14  is a vastly inadequate way of measuring the value of it.

15  And you gave me the Coca-Cola example, which, while not

16  necessarily on all fours, is pretty persuasive to me.  I

17  don't think this is a place where we would just look at

18  the development cost of the trade secret.  But although

19  Mr. Agoglia really emphasizes that development cost as

20  "the" way to calculate the value, it's not the only way.

21      There's also the question about the diminishment of

22  the value of the trade secret as a result of the offense.

23  And so I think that's the argument that you're trying to

24  make to me, which is that we have to look at some kind of

25  a proxy for the value of that trade secret.

 1          And so, so far, am I right; is that really what we're

 2    looking for is the value of the trade secret?

 3              MR. O'SHEA:  Yeah.  Correct.

 4              THE COURT:  Because I certainly agree with you

 5    that the sequence of actions here had catastrophic effects

 6    on AMSC and Massachusetts wind turbine operators.  But in

 7    calculating the loss amount, do I get to look at all that

 8    or do I just -- am I just really trying to find a proxy

 9    for the value of the trade secret?

10              MR. O'SHEA:  I suggest that the market value is a

11    fair proxy of the value of the trade secret, because what

12    changed?  You know, AMSC, for a while, they have all the

13    same people, they have all the same equipment, they have

14    all the same computers and forklifts and everything is the

15    same.  What changed?  The trade secret is stolen.  And

16    then the market, when they're fully informed, "Hey, the

17    trade secret is stolen," that's what's there.  So I think

18    that is a totally fair representation of the value of the

19    trade secret.  That's number one.  Mr. Agoglia likes

20    development costs and I've got the Coca-Cola example in

21    there.

22          The other part is the Court -- as we learned at

23    trial, the PLC and the PM3000, the physical products and

24    the software, developed incrementally over many years.

25    And the changes in the LVRT are so interwoven with

1    existing software and the many many generations, it

2    changes.  It would be an exercise, an expensive and futile

3    exercise, to try to subtract all of that out.  So that's

4    why we didn't fiddle around with development costs.

5            THE COURT:  Okay.  So the difficulty that I have

6    with the events, I'm not saying I'm not -- it certainly

7    has the virtue of simplicity to just look at the stock

8    price.  But the concern that I have is that the stock

9    price fell not just because the trade secret was stolen,

10   it fell because Sinovel then canceled its contracts.

11       And so Mr. Agoglia then has an argument, with some

12   force, that really that's kind of a consequential damage

13   from the theft itself.  It's not directly from the theft.

14   I don't really care whether Mr. Agoglia is going to try to

15   persuade me that it was just a legitimate business dispute

16   and that the turbines -- the equipment was nonconforming

17   because it didn't pass the LVRT standards.

18       I'm persuaded that the theft of the trade secret

19   occasioned Sinovel to abandon its contracts and to

20   repudiate its contracts with AMSC because now having the

21   availability of the software, they were able to supply the

22   power conversion equipment with cheaper components.

23           MR. O'SHEA:  Right.

24           THE COURT:  I'm persuaded by that.  I think that

25   was amply established really at trial, although there's

1 really no jury finding on it.  But when I look at it, I

2 think the evidence establishes to a preponderance that the

3 reason Sinovel canceled its contracts was that they had

4 acquired the software needed to run the components, so I'm

5 persuaded of that.

6          MR. O'SHEA:  Okay.

7          THE COURT:  But it does seem to me there's an

8 intermediate step in there.  It isn't just the pure theft

9 of the trade secret; it's that and then the canceling of

10 the contracts.

11          MR. O'SHEA:  And it was a conspiracy and there's

12 a scheme with multiple objects.  And we see here

13 Karabasevic talking about his conversation with Mr. Zhao.

14 He says, "Hey" -- and this is in April, a month after his

15 theft -- "Hey, we talked about it.  They're breaking up."

16 This was part of the scheme.  This was part of the wire

17 fraud scheme.

18          THE COURT:  And for Mr. Karabasevic.

19          MR. O'SHEA:  Yeah.

20          THE COURT:  And factor this in for me: He

21 intended to inflict harm on AMSC.  That was part of his

22 object.  I don't know -- you can help me out if I'm

23 misunderstanding that -- I don't know, is it fair to call

24 that an object of the conspiracy when one of the

25 conspirators had this as the object?

1           MR. O'SHEA:  And as we developed at trial,

2   Karabasevic is an agent of Karabasevic.

3           THE COURT:  Yes.

4           MR. O'SHEA:  There's no Mr. Karabasevic hiding

5   behind the curtain -- or Mr. Sinovel hiding behind the

6   curtain.

7           THE COURT:  I agree with that, but here's my

8   question --

9           MR. O'SHEA:  Yeah.

10          THE COURT:  -- I'm not sure that it was Su and

11  Zhao, the other main conspirators, that they cared

12  particularly to inflict the harm on AMSC.

13          MR. O'SHEA:  They certainly -- as a whole, the

14  communications certainly made clear that they intend to

15  take something from --

16          THE COURT:  True.

17          MR. O'SHEA:  -- AMSC.

18          THE COURT:  That's very true.

19          MR. O'SHEA:  They knew better.  I mean, it's a

20  zero.  If they have the benefit, then AMSC loses.  That is

21  just -- there are -- in terms of the stock, when we talk

22  about that being a rough approximation, we see

23  communications where Karabasevic reflects that other

24  engineers at Sinovel were following the stock price drop

25  of American Superconductor.  I don't think he was the only

96

1  one taking delight in it.

2       In another communication later he talks about,

3  Mr. Karabasevic -- I'll find it real quick.  I'm sorry.

4  It's the one where he says it goes to billions in the end,

5  but he says that they're not going to pay American

6  Superconductor the 150 million they owe them and at the

7  end of the day it goes to billions in the end.  I mean,

8  this is -- he's an agent.  He's talking often and relating

9  conversations with Su and Zhao.  That's what the whole

10 scheme was about.

11          THE COURT:  There's a fine distinction.  I agree

12 that the whole scheme was to acquire the software that

13 AMSC had developed.

14          MR. O'SHEA:  Yeah.

15          THE COURT:  And I think it was Karabasevic's

16 personal goal to inflict harm on AMSC.

17          MR. O'SHEA:  Right.

18          THE COURT:  But I'm not sure that the stock price

19 decline was an object of the conspiracy.

20          MR. O'SHEA:  Yeah.  Well, the bank robber doesn't

21 intend to sideswipe a pedestrian.  But if that's what

22 happens, that's what happens.  So we just take the facts

23 as they are.  It is a result, direct result, of Sinovel's

24 crimes and their schemes.

25          THE COURT:  Okay.  All right.  Mr. Agoglia, you

1   want to be heard on that, I assume.

2        MR. AGOGLIA:  I do, Your Honor.  Thank you.  We

3   do submit that if we are going to be following the

4   guidelines, we do need to look at what they say and the

5   Seventh Circuit says is the primary basis to value loss

6   for purposes of 2B1 calculations.  It is development

7   costs.

8        THE COURT:  I'm going to cut you off.  I don't

9   need to hear any more about that.  The guidelines say

10  development cost or the diminishment of the value.  In the

11  *Pu* case, they say when there's nothing else, when there's

12  no gain to the defendant, you can look at development

13  costs.  But that is an unreasonably circumscribed view of

14  the valuation in this case.  And so I think we're

15  really -- in the prong here where we're looking at the

16  diminishment of the value, that's where we are.

17       MR. AGOGLIA:  I start with *Pu*, Your Honor, but we

18  do address and intend to address how else you might

19  approach the valuation question, because we have concerns

20  about methodology here and these are issues that are the

21  sort of *de novo* review issues that we are concerned about.

22       The other common, accepted method for valuing, we

23  provided the circuit authority cites for it, is to look at

24  sales diverted from AMSC to Sinovel in terms of third

25  parties.  Let me address that.

1          THE COURT:  Okay.

2          MR. AGOGLIA:  The evidence at trial, we submit,

3   was overwhelming that the software here was used only in

4   AMSC machines.  We think the evidence at trial was

5   overwhelming from the AMSC engineers, from both Austria

6   and from here, that that is what you would expect because

7   it was bespoke.  It was written specifically for that

8   hardware and that you would have to reengineer it to make

9   it work with the so-called *cheaper components*.

10      There's not a piece of evidence in this record that

11  Sinovel sold any component with that software to somebody

12  else or used it in another turbine.  They used it with

13  AMSC products.  That's what was taught by the evidence

14  from Massachusetts.  And they modified it to make it work

15  as they believed it was required to work from the start.

16  The LVRT stuff is what was modified there.

17      So we think that's the evidence and that means

18  something for valuations.  It means if we're not in a case

19  where you would look at the total --

20          THE COURT:  Remind me, was it AMSC power

21  conversion equipment in the Massachusetts wind turbines?

22          MR. AGOGLIA:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. AGOGLIA:  Both their PLCs and their power

25  converters.

1            THE COURT:  Yeah.

2            MR. AGOGLIA:  And it was the binary files which

3    the FBI agents trace back to the original source code.

4    That was the again proof of use, but use with AMSC

5    components.  And again we would submit that's the only

6    natural consequence of what the engineers testified to.

7    And this is separate and apart from the side issue of the

8    encrypted communications portal.  That really was designed

9    to safeguard AMSC from having a different converter work

10   with their programmable logic controller.

11           But the IP that controlled both of those was

12   specifically designed for those pieces of hardware and

13   would not work unless you reengineered it.  And we heard

14   various testimony about the difficulty of doing that and

15   whether it would be cheaper to start from scratch.

16           So we're not in that circumstance where you would

17   have a normal IP valuation scenario where we're looking at

18   product sales from Adobe that were diverted to the

19   defendant's customers.

20           THE COURT:  I understand.

21           MR. AGOGLIA:  So that would be the second and

22   most logical basis to look at it.

23           The other ways in which, if you look at civil

24   misappropriation standards as an alternative accepted

25   methodology, they ask, if you want damages, you must show

1   either that the theft deprived the company, AMSC in this

2   instance, from the opportunity to continue using it, which

3   didn't occur here -- it was a copy; they had it; they

4   still had the ability to use it freely with other

5   customers -- or, independently, that the defendant

6   publicly disclosed it and therefore eliminated the secret

7   and value from the secret.

8               THE COURT:  That's not the case here either.

9               MR. AGOGLIA:  So those are -- and that's why we

10  submit to you that the development cost is a metric used

11  in these cases.  In that scenario, it wouldn't be nothing.

12  It would be, "Okay.  So what did it cost you to do that?"

13       And the evidence at trial, we think and submit, is

14  that they have in this development where -- in

15  Mr. Buerosee's chart, his chart of stages -- everything up

16  to the source code writing had been purchased in advance.

17  But whatever the development cost they would want to

18  submit are, they haven't done that.  We have nothing.

19              THE COURT:  I agree with you there.

20              MR. AGOGLIA:  But I raise that because those are

21  the only three accepted metrics.

22              THE COURT:  Yeah, but you're overlooking

23  something here and that is that you say that there's no

24  evidence that anyone used the AMSC software with any

25  components other than AMSC components.  We don't know what

1  Sinovel did with the software once it misappropriated it.

2  We don't know what's going on in China with Sinovel and

3  its operations or anywhere else in the world.

4      The point of it, and there was evidence in the case

5  that said this, was that the objective was to get the

6  software.  And once the software was acquired, then it

7  could be used with other cheaper components and Sinovel

8  would not have to buy from AMSC anymore.

9      The software was kind of the reason Sinovel was

10 committed to buying AMSC equipment, because it had

11 software that worked.  They could misappropriate the

12 software, then they would be free to use other components

13 with it.  That was their intent.

14     We don't know what they did in China with it.  They

15 fled the United States and so we don't have any use in the

16 United States with other equipment.  But we don't know

17 what happened in China.  And there was evidence in the

18 case that that was their objective of the conspiracy.

19          MR. AGOGLIA:  I would just note, Your Honor, that

20 that evidence was, at best, thin, that the engineering

21 testimony was very clear that that you could not do.

22          THE COURT:  This needed to be edited or revised

23 to work with other components partly because of the

24 protections that were built into the AMSC software and

25 that the acquisition of the source code was what made that

1    editing possible.

2        I grant you, this is not the prototypical case where

3    we have a software company stealing software from somebody

4    else and then selling it to somebody else.  We have both

5    parties are bundlers, I guess I would say.

6        So AMSC has software which it maintained as a trade

7    secret and then incorporated into its equipment so its

8    equipment would work.  That software was a very important

9    part of the functionality of that equipment.  And they

10   took fairly extraordinary steps to make sure that a person

11   who bought a piece of the power equipment couldn't reverse

12   engineer and take the software out of it.

13       Then Sinovel is in the same situation.  They didn't

14   want to sell LVRT software or power control software.

15   They just wanted to have working software that worked so

16   that they could get their equipment for as cheap as they

17   could get it.  They didn't want to have to pay the AMSC

18   premium price for the equipment; they wanted to do it on

19   their own.

20       So there's nobody selling it or disclosing it

21   anywhere else, so it's an atypical case.  But the sales

22   that are diverted from AMSC are Sinovel's own use.

23           MR. AGOGLIA:  That would be Sinovel's use in

24   AMSC's products though, Your Honor.

25           THE COURT:  That's what you say.  But what I'm

1   saying is that the testimony at trial, and we really don't

2   know what happened in China after the theft, but the

3   testimony was -- I don't think it was thin at all.  It was

4   very clear that this was what the object of the conspiracy

5   was: to get this software.

6        And Karabasevic certainly wasn't concerned with

7   making sure that Sinovel had a compliant product.  He said

8   he was out to get -- he's resentful and angry and he

9   relished the decline in the stock price.  It's not thin

10  at all.

11        MR. AGOGLIA:  I think it's thin on any of the

12  documents that said, from Sinovel's perspective, "We now

13  are going to deploy this in other goods and products," and

14  there's just a complete failure of proof that that didn't

15  happen.

16        That matters in this context: I would say that the

17  evidence was overwhelming that the changes that were

18  made -- and bear in mind, for the second of the two

19  components, the PLC, it was only binary files -- the

20  PM3000.  I'm sorry.  I've got it backwards -- which

21  everyone said, all the experts agreed, you couldn't

22  reverse engineer to do that in the first place.  So for

23  the programmable logic controller, that was a theoretical

24  possibility.

25        But I do think the undisputed testimony at trial is

1  that would be a herculean undertaking to reengineer that

2  stuff because of the way in which, from scratch, it's

3  written for particular hardware.  And I think there was

4  one witness who said it would be as quick probably to

5  start from scratch with your own source code, so there

6  were challenges.

7       And why is that relevant?  Because I think the

8  evidence of how they used it was to make what at that

9  point was, the horns of the dilemma was, we've got

10 thousands of units in the field that need to work with the

11 LVRT grid code requirements.  And I think the evidence was

12 undisputed that that would need to be addressed with those

13 existing units.

14      So there was an enormous incentive, I grant you, to

15 have that software and have it work and we would say great

16 frustration in the inability to make that work through the

17 ordinary commercial channels.  But I don't think there's a

18 piece of evidence that it was ever actually used in a

19 component that wasn't an AMSC component, which means they

20 are still tied, inextricably tied, to each other.

21      And I think the sales data, in terms of post offense,

22 doesn't support -- I understand the Court's questioning

23 about what happened in China.  But on a bottom-line level,

24 we do have the information that there was a nosedive in

25 new sales and that there was existing income because they

1    were already up on wind farms and in grids, but that's

2    what the financial information shows.  So I don't think it

3    even supports an inference --

4            THE COURT:  You're talking about the downturn in

5    the wind market?

6            MR. AGOGLIA:  Downturn in the wind market and

7    downturn that was specific to Sinovel, that Sinovel not

8    just lost absolutely, but it lost market share relative to

9    everyone else in the China wind market, which was a

10   function of them not expanding their footprint or

11   declining more rapidly.

12       But let me just speak briefly to this notion of a

13   stock market valuation.  Again I don't think there's a

14   factual and causal issue, which the Court is aware of

15   we've advanced, that you look at that stock drop and it is

16   triggered by the announcement of the rejection of goods.

17       So you have to make a determination that but for the

18   theft of the software, Sinovel would not have rejected the

19   goods.  And we think there are factual reasons why you

20   can't do that, including temporally that that March

21   shipment was already overdue for months before that

22   happened.

23       And I would say that what has not been ever adduced

24   in this record, despite thousands of reams of

25   communications, is anyone -- D.K. -- Karabasevic, excuse

1  me -- Su, Zhao -- saying, "Now we got it.  Now we can" --

2  I mean, Karabasevic is a disgruntled employee and he

3  certainly said things like, "Now you can be free of AMSC,"

4  but said that in the context where they were modifying it

5  to use, in that moment, using AMSC components.

6       So I don't think you can attribute the stock market

7  drop even to the theft of the trade secret without making

8  a lot more specific finding.  It's also a very very

9  inexact, we would say impermissibly inexact, proxy for the

10  trade secret value itself that if you're looking at

11  causation, you would fairly, even in the worst-case

12  scenario, attribute some of that drop to a deterioration

13  in the commercial relationship which, as a matter of

14  record, was something that existed and endured between the

15  two parties.  That had to be repaired for those shipments

16  to come back online.

17       So it's not -- I've never seen any authority which

18  recognizes that stock market drop as a proxy for the value

19  of the trade secret at issue, particularly here where the

20  trigger of the drop for public disclosure was not any

21  information about the theft of trade secret.  The market

22  responded to a rejection of orders.  So I think that's

23  problematic.

24       And then as to the D.K. statement, he is absolutely a

25  disgruntled former employee and after the fact says -- you

1  know, I dare say revels in the fact -- that there's

2  misfortune at his former employer.  That isn't a basis to

3  either impute that to the entirety of Sinovel as having

4  intended from the outset to harm AMSC.  And I think under

5  *Pu*, what you can't do is impute an amount by which they

6  intended to harm from those facts.  And I think that's the

7  teaching from the Seventh Circuit.

8           THE COURT:  I'm not clear how *Pu* gets us there,

9  but --

10          MR. AGOGLIA:  Well, in *Pu*, as I understand it,

11 the intent-to-injure component was what they were

12 calculating loss under, not actual loss, because there

13 hadn't been actual loss.

14          THE COURT:  Yes.

15          MR. AGOGLIA:  And then the district court had

16 used development cost information, approximately

17 $12 million, from the affected companies to say, "Aha,

18 that is the number we're going to arrive at as your

19 intended cost."

20     And the Seventh Circuit said, "No.  You don't have a

21 nexus between those two.  You have to show more than an

22 intent.  You have to show -- you have to prove the amount

23 by which they intended to harm separately."

24          THE COURT:  It is such an apples-to-oranges

25 comparison.  I don't see that *Pu* has that much really to

1   teach us because the problem in *Pu* was that the guy didn't

2   intend to -- he simply intended to use the software for

3   his own benefit.  He didn't intend to deprive his former

4   employers of the software that he took.

5           MR. AGOGLIA:  I think Mr. O'Shea said we're not

6   here addressing under the guidelines sort of an intent to

7   harm.  All I'm saying is I think what *Pu* would say is, if

8   you were to go there, you would have to have a basis to

9   find the amount by which the defendant intended to harm,

10  not just the fact of intent.

11          THE COURT:  I think Mr. O'Shea said we're not

12  doing intended harm.

13          MR. AGOGLIA:  Okay.

14          THE COURT:  We're doing the actual harm.  All

15  right.  I'm prepared to make a ruling on this.  It's a

16  complicated and not a prototypical "theft of trade secret"

17  case.  But I'm convinced that the offense resulted in a

18  loss that exceeds $550,000.  And so as to that element, I

19  think the 30-level enhancement is appropriate.

20      I do think that the evidence persuades me, certainly

21  to a preponderance of the evidence, that there is a chain

22  of cause and effect and that the theft of the trade secret

23  and the criminal copyright infringement too, which is a

24  different thing -- you know, you don't have to, you know,

25  penetrate any secrecy of just using copyrighted goods

1  without authorization with an intended financial gain --

2  that Sinovel intended to misappropriate this software,

3  thereby achieve the ability to be independent of AMSC.

4       And it was as a result, and judged primarily by the

5  sequence of events and the lack of other explanations,

6  that once the trade secret was misappropriated, it was

7  then free to repudiate those contracts.  And so the

8  repudiation of the contracts then was the precise and

9  immediate cause of the precipitous drop in stock price.

10       Either way, whether we judge it by the decline in

11  stock price or the immediate loss in business, and I'm

12  cautious here that we are not judging the loss by the loss

13  of the expectation of the performance of the contracts,

14  but it was the loss of the software's secrecy, the fact

15  that Sinovel had engaged Karabasevic to steal it, gave

16  them the freedom to repudiate those existing contracts.

17       And so that without that component of their product,

18  the software protected by intellectual property through

19  copyright as well as trade secret protection, that that

20  led very directly to the repudiation of those contracts

21  and that that is what caused the stock price and the loss

22  of business, either one of which would get us to a loss

23  that exceeds $550,000.

24            MR. O'SHEA:  Your Honor, you said 550,000.

25            THE COURT:  I'm sorry, 550 million.

1          MR. O'SHEA:  Thank you.

2          THE COURT:  550 million.  There's a lot of zeros

3    here.  It's easy to get confused.

4          MR. O'SHEA:  Yeah.

5          THE COURT:  550 million.  So I think that is the

6    objections on the guidelines.  Are there any other

7    objections on the guidelines?

8          MR. AGOGLIA:  Our addendum and written

9    submissions, you know, speak for themselves there, but we

10   understand your finding.

11         THE COURT:  Yeah.  And again I'll just note

12   again, I said it repeatedly, this really is an academic

13   part of our sentencing here.

14       So base offense level is 7.  We have the loss amount

15   gives us an additional 30 levels.  We've got the

16   substantial part of the offense committed outside the

17   United States.  That gives us a two-level enhancement

18   under 2B1.1(b)(9)(B).

19       Then we have the special offense characteristic that

20   AMSC was a publicly-traded company that had more than a

21   thousand employees at the time of the offense.  Therefore,

22   there would be a four-level increase that is warranted

23   under guideline section 2B1.1(b)(14)(B)(ii)(I or II).

24       I'll note here too, by the way, that we're using the

25   2010 guidelines.  So if you want to trace, for those of

1  you scoring at home, don't forget to use the 2010

2  guidelines, because that particular offense characteristic

3  is different than the newer guidelines as well.

4      So that gives us a total offense level of 43, which

5  would be relevant to my adjustment of the fine amount,

6  which I'm not able to do here because there was not a

7  finding about the loss amount found by the jury.

8      So I'm going to ask Mr. O'Shea to correct me if I'm

9  wrong here, but my understanding is that I'm stuck then

10 just with the statutory limit of the fine and this

11 guideline calculation would be relevant to a fine

12 multiplier which doesn't apply here.

13          MR. O'SHEA:  That's true.

14          THE COURT:  So for all that work, and I know

15 there are other reasons regarding the expression of

16 outrage at criminal activity, and so on, that we want to

17 fix the loss amount and recognize the consequences of the

18 crime on the victims here, but for guideline purposes, it

19 doesn't really affect the sentence.

20      So now the question is what fine should I impose.

21 And I believe that we have agreement on restitution and

22 that the government is not asking me to find a restitution

23 amount, which I'm glad to hear because I'm glad I've got

24 the evidence, but there are some pretty difficult

25 questions here to really nail down the restitution amount.

1  Under the circumstances here, if I've got an agreement

2  between the defendant and the victims as to what a

3  compromised amount of restitution is, I'm going to respect

4  that.

5      And this is one of those cases where I can avoid a

6  lot of very difficult decision making and calculations.

7  I've got the evidence presented.  Frankly, I might want

8  more if I actually were to fix the restitution amount, for

9  various reasons which I'll highlight here.  I'm confident

10  that the restitution amount would probably be more than

11  the compromised amount, that's what compromises are, but I

12  have my misgivings about the approaches of value.

13      I'll note this one here:  The one that would be most

14  tailored to figuring out the diminished value of the

15  intellectual property at issue here, which is the

16  copyright and trade secret reflected in the source code,

17  that would be some sort of evaluation of the IP revenue.

18  I would love to have that.  But I'm afraid that the 25%

19  attribution was just kind of pulled from thin air.

20      And so in a case in which you are valuing

21  intellectual property, you would look for comparable

22  sales.  It's not that different from real estate, frankly.

23  You'd look for some comparable sales and you'd find out

24  what software like this is worth.  You'd find out whether

25  there were any licenses that were done for this.  You

1    might compare the market value for power conversion

2    equipment by other manufacturers that didn't have the AMSC

3    software.  There would be all sorts of ways of actually

4    trying to solve for the variable of the value of the

5    intellectual property that was misappropriated.

6         And I just think I have such -- it probably

7    overstates its accuracy to call it *rough and ready*.  And

8    so I just -- that is the one that I think would be the

9    best way to really approach the value, the diminished

10   value, of the intellectual property as a result of the

11   theft.

12        I've got respect for how complicated the project is,

13   but there are people who do this kind of work.  And

14   basically a search for appropriate comparators with

15   adjustments for the differences between the comparators

16   and the product here would have been I think a good way to

17   go with it.

18        There's nothing wrong with the way that AMSC priced

19   and packaged its products, perfectly appropriate, but it

20   does make it a little bit harder to solve for the variable

21   that is most important for me here.

22        With the market loss, I do have my concerns, as I've

23   indicated, that there is a sequence of causes there.  The

24   consequences of the crime were very substantial.  I don't

25   know that the market loss really gets us to that very

1   direct diminishment of value of the intellectual property,

2   which I think is what the law tells me I really should be

3   looking at here.

4       I know there are other aspects of the crime: It is a

5   conspiracy.  But the overall object of the conspiracy, it

6   seems to me, was to expropriate the software and the

7   intellectual property that it reflected, and that was the

8   object of the conspiracy.  That was also the object of the

9   wire fraud crime as well.

10      I don't have any trouble seeing that the

11  Massachusetts turbine owners are victims here.  It's kind

12  of a coarse metaphor here to call them a "pedestrian

13  sideswiped by a bank robbery."  But I do think that the

14  flight from the United States, after the charges were

15  brought, was part of a common scheme or conspiracy, that

16  it was a flight to avoid prosecution as a result of the

17  charges being brought.

18      So as a result of that, Sinovel withdrew from the

19  United States and left the Massachusetts turbines damaged.

20  You know, it wasn't literally side-sweeping, but it's not

21  that far off.  And so the owners of the turbines had to

22  fend for themselves in order to keep their turbines

23  running, so I have no trouble finding them to be victims

24  of the offense.

25      And again, as far as the amount goes, it's

1   complicated, but we have an agreement.  So if I'm called

2   do it, because of the failure of Sinovel to make good on

3   its promises in the settlement agreement, we'll sharpen

4   our pencils and do more work on it.  But I don't think

5   that I have to -- I'm called upon to make that

6   determination today in light of the settlement.

7        The lost gross margin revenue approach I think

8   suffers from the vulnerability that Mr. Agoglia points out

9   that it is really much more heavily oriented toward a

10  recovery of expectation damages which I don't think are

11  appropriate to recover on as restitution.

12       So those are my misgivings about the valuation

13  approaches here.  I'll do the work if I'm called upon do

14  it, but I don't think at this point I'm really called upon

15  to do it.  And I think Mr. Agoglia has indicated that the

16  loss amount is at least enough to support the $500,000

17  per-count fine, so I think the fine would be $1.5 million.

18       I will provide as a condition of probation that

19  Sinovel make good on its promises under the settlement

20  agreement.  I don't know if there are any other conditions

21  that are warranted or appropriate here.  I thought about

22  whether we should have conditions imposed should Sinovel

23  decide to do business in the United States, but that might

24  seem like a daunting task to craft those conditions and I

25  don't know if they're really worth it.

1        What I had in mind was something like if Sinovel were

2   to return to business in the United States, they would

3   have to demonstrate to the probation office that they had

4   an intellectual policy and program in place to prevent

5   theft of intellectual property as a condition of their

6   returning to business in the United States.  But that

7   seems like a remote contingency and even that condition

8   might be very hard to craft in a way that's really

9   meaningful.

10       So, Mr. O'Shea, are there other conditions that would

11  be appropriate?

12           MR. O'SHEA:  No.  And I thought about, as the

13  Court has, whether there were other conditions that we

14  could impose should they return to the United States --

15  that seems remote -- and absent a return to the United

16  States.  Even if they returned to the United States, it

17  would be difficult to genuinely enforce those conditions

18  in terms of what policies were really being followed in

19  China at all.

20           THE COURT:  Yeah.  And I think to add one more

21  point to that, I think they had policies in place now or

22  at the time of the offense.  But having a policy and

23  actually respecting the intellectual property rights of

24  your business partners are two different matters.

25           MR. O'SHEA:  Well, it's the president's and CEO's

117

1   seal on Karabasevic's contracts, so I would suggest they

2   weren't enthusiastically followed at the time.

3          THE COURT:  That's certainly true.

4          MR. O'SHEA:  So I would suggest that the two

5   probation conditions be to pay the $850,000 to the

6   Massachusetts turbine owners.  I believe that's set up to

7   go into the Fairhaven account and that they will divvy it

8   up, that we'll trust those folks to divvy it up from

9   there.  And then I understand Sinovel is going to pay

10  American Superconductor an additional $25 million in ten

11  months from now.  That's my understanding and that's what

12  I suggest should be the conditions.

13         THE COURT:  Under those circumstances, since the

14  last payment is due in ten months, it seems appropriate to

15  make the term of supervision a year then.

16         MR. O'SHEA:  Yes.  I agree.  I did not understand

17  that Sinovel was agreeing that the $1.5 million was the

18  appropriate fine.  I also understand that they suggest the

19  payments should be spread out.  I have some arguments in

20  support of the $1.5 million fine, but if that's no

21  longer --

22         THE COURT:  Well, let's find out.  Maybe I'm

23  reading too much into the sentencing memorandum that I

24  have got here.  So, Mr. Agoglia.

25         MR. AGOGLIA:  Sinovel's position on the fine,

1    Your Honor, is that, number one, it concedes that the

2    amount of agreed-upon restitution is in and of itself

3    sufficient to authorize the Court to issue a fine up to

4    the requested maximum of 1.5.  So there isn't a sentencing

5    guideline issue, which is why we said it was academic.

6              THE COURT:  Yeah.

7              MR. AGOGLIA:  Whatever that max is that is

8    authorized, you would still appropriately consider things

9    like the payment of the fine on the payment of

10   restitution.  We think the presentation on Sinovel's

11   finances was pretty straightforward at the end of the day.

12   They paid $32.5 million.  Total cash reserves were 38.

13        So we simply say we commit to your discretion whether

14   or not that should be adjusted downward at all from 1.5

15   and staggered in some way in light of the interest in

16   making sure it does not have the effect of interfering

17   with the promised payments of restitution.  This is not

18   something that we intend to address further than

19   committing it to Your Honor's discretion.

20             THE COURT:  All right.  I will impose the $1.5

21   million fine.  I know that Sinovel's prospects have

22   diminished since the offense was committed as well.

23   Nevertheless, I think that in light of the financial

24   statements that I have received, which do not paint a rosy

25   picture, but nevertheless suggest that there are resources

1  available that would allow them to pay a $1.5 million

2  fine, that in the complex of this case, it's a relatively

3  modest amount and one that I don't think is significant

4  enough to interfere with Sinovel's ability to make the

5  restitution payments.

6      And in this case, as in any other, I would, as the

7  law tells me to and as well as just a matter of simple

8  justice, provide that the payment of restitution should

9  take priority over the payment of any fines.  The victims

10 should get paid before the government gets paid.

11     But I will impose the maximum fine because I think

12 that this is a -- it's obviously a very serious,

13 calculating offense.  The consequences were really

14 devastating and I want to send the message to the

15 defendant that the Court strongly disapproves of this;

16 that the restitution, appropriately limited to direct

17 loss, does not capture the full impact on the victims here

18 and it also doesn't fully appreciate the impact that it

19 has on business relations between the nations; but also,

20 just in general, that failing to respect intellectual

21 property rights is a serious crime that inhibits the fair

22 exploitation and development of technology.

23     So in view of the seriousness of the crime and to

24 promote respect for the law, I am going to impose the

25 maximum fine of $1.5 million.  As I said, it doesn't

120

1   interfere with the payment of restitution.

2        As far as the payment of the fine, it seems --

3            MR. O'SHEA:  If I could be heard on the timing.

4            THE COURT:  Yes.

5            MR. O'SHEA:  I would respectfully request that it

6   be immediate.  Sinovel, even under their numbers, they

7   have the cash reserves to pay the fine and restitution.

8   This is punishment.  It is supposed to hurt.  And given

9   the scale of the harm, even what the Court found,

10  550 million, I think it is fair that the payment be

11  immediate.  That's the first part.

12       Secondly, if Sinovel chooses to appeal, I would

13  request that they escrow the entire amount of that fine

14  pending appeal, as the Court is permitted to do.

15           THE COURT:  All right.  Mr. Agoglia, is this

16  something you want to be heard on or will you commit this

17  to the discretion of the Court as well?

18           MR. AGOGLIA:  I think, whether I agree to it or

19  not, that's what Article III confers on you.

20           THE COURT:  Yes.

21           MR. AGOGLIA:  I would note that 18 USC 3572

22  provides a minimum period of 30 days and that it is

23  completely premature to address questions about what

24  should be done on appeal.

25       There may be questions that are served up to you,

1  there may not be.  There may be questions in terms of a

2  stay and the conditions of a stay served up to the Seventh

3  Circuit.  So it's a very fluid set of circumstances.  We

4  would want to be heard specifically about any formal

5  request to escrow.

6           THE COURT:  Yeah.

7           MR. AGOGLIA:  It's not the time to do that.

8           THE COURT:  All right.  I will provide that the

9  payment of the fine should be made within 30 days.  I'll

10 tip my hand that I would be respective to a motion to

11 escrow the fine pending appeal.  I won't make the decision

12 now because there's no appeal and nobody has asked me to

13 do it, but the briefing can be succinct on the subject.

14 So that will be my order on the fine: payment within 30

15 days.

16     And then I think I will ask Mr. Williams to circulate

17 to the parties the exact language that we'll use to

18 establish the two conditions of supervision, which is that

19 Sinovel complete the $850,000 payment to the Fairhaven

20 account for further distribution.  And that payment is in

21 process already, so we won't be paying it to the court for

22 distribution.  It's going to be paid directly to the

23 victim.  That's also true, I gather, with the payment to

24 AMSC?

25           MR. AGOGLIA:  Yes.  Your Honor, I would suggest

1   that the Court's order direct that the agreements be

2   fulfilled according to their terms, because there are

3   those specific payment terms.

4           THE COURT:  Yes.

5           MR. AGOGLIA:  There is, for example, a specific

6   payment term that Mr. Deane negotiated about the eventual

7   resting spot.

8           THE COURT:  Yes.

9           MR. AGOGLIA:  There are third-party guarantees

10   with respect to the second payment due to AMSC that I

11   don't believe the Court intends to modify/alter/interfere

12   with.  And so we would want the Court's order to simply

13   reflect that the parties are, as a condition of probation,

14   directed to do what they are obligated to do.

15           THE COURT:  I think that's fair.  So I can state

16   them here on the record then.  Condition No. 1 is that

17   Sinovel pay the agreed-upon restitution amount to the

18   Massachusetts turbine owners pursuant to the terms of that

19   agreement and that it pay to AMSC the remaining payment --

20   restitution payment pursuant to its agreement with AMSC.

21   That should cover that.  All right.  And the term of

22   probation will be one year.

23      And just so cards are on the table, if payments don't

24   get made, it is my intent that we would have a

25   resentencing.  I believe that I've got the evidence that I

1   would use on that.  But if it comes to that, if the

2   parties can be heard about whether I need to hear any

3   additional evidence, then I will do the work of settling

4   the restitution amount then should Sinovel fail to make

5   the payments per its agreements to the victims.

6        All right.  Is there anything else we need to address

7   today?

8            MR. O'SHEA:  Nothing for the United States.

9   Thank you.

10           MR. AGOGLIA:  Nothing for Sinovel, Your Honor.

11           THE COURT:  Okay.  One last thing though is that

12  Sinovel has the right to appeal its conviction and it's

13  got the right to appeal the sentence that I have imposed.

14  And if it wants to do that, it has to file a notice of

15  appeal within 14 days of entry of judgment or within 14

16  days of any notice of appeal that would be filed by the

17  government.

18       Is there anything else about the right to appeal that

19  we need to address?

20           MR. O'SHEA:  Nothing.

21           THE COURT:  There you go.  You've got your right

22  to appeal.  All right.  Thank you all.

23       (Adjourned at 12:03 p.m.)

24                              ***

25

124

1              I, CHERYL A. SEEMAN, Certified Realtime and Merit

2    Reporter, in and for the State of Wisconsin, certify that

3    the foregoing is a true and accurate record of the

4    proceedings held on the 6th day of July, 2018, before the

5    Honorable James D. Peterson, Chief Judge of the Western

6    District of Wisconsin, in my presence and reduced to

7    writing in accordance with my stenographic notes made at

8    said time and place.

9    Dated this 19th day of December, 2018.

10

11

12

13

14

15                          _____
                                      /s/

16                          Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter

17

18

19

20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25